## In re: IMMUNE RESPONSE SECURITIES LITIGATION.

### No. 01CV1237JWMC.

United States District Court,
S.D. California.

June 7, 2005.

---

984

**994**

Edward Phillip Dietrich, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA, for plaintiff and movant.

Patrice Lyn Bishop, Stull Stull and Brody, Los Angeles, CA, Darren Jay Robbins, Lerach Coughlin Stoia Geller Rudman and Robbins, Brian J. Robbins, Robbins Umeda and Fink, San Diego, CA, for plaintiffs.

Richard Mark Segal, Pillsbury Winthrop Shaw Pittman, Daniel Evan Eaton, Seltzer Caplan McMahon Vitek, San Diego, CA, Dennis J. Block, Jonathan M. Hoff, Danielle D. Dooley, Cadwalader Wickersham and Taft, New York, NY, for defendants.

## ORDER: (1) DENYING DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT; AND (2) DENYING DEFENDANTS' REQUESTS FOR JUDICIAL NOTICE

JONES, District Judge.

This is a class action[1] on behalf of all persons ("Plaintiffs") who bought shares of Immune Response Corporation ("IRC") between May 17, 1999 and July 6, 2001 (the "Class Period"). (Compl.¶ 1.) Plaintiffs allege IRC and its representatives made false and misleading statements about the efficacy of REMUNE—a drug IRC developed for the treatment of human immunodeficiency virus ("HIV"). Specifically, Plaintiffs allege securities fraud under the 1933 Securities Exchange Act §§ 11, 12(a)(2), and 15, as well as, Securities Exchange Commission ("SEC") Rule 10b–5 and §§ 10(b), 20(a) of the 1934 Act. Defendants[2] now move to dismiss under Fed.R.Civ.P. 12(b)(6) and 9(b). Plaintiffs oppose the Motions. For the reasons set forth below, Defendants' Motions are **DENIED**.

### Request for Judicial Notice

■ Defendants request incorporation by reference and judicial notice of various documents, some of which Plaintiffs oppose.[3] As set forth below, the Court **DENIES** Defendants' requests.

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001); *Pelletier v. Federal Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir.1992) (review "on a motion to dismiss is limited to the contents of the complaint"). Additionally, the Court is "required to presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the non-moving party." *U.S. v. LSL Biotechnologies*, 379 F.3d 672, 698 (9th

---

1. There were initially ten related class actions, which were consolidated. (*See* Court's April 4, 2002 Order in Civil Case No. 01CV1257.) The operative Amended Consolidated Complaint, filed July 31, 2003, will be referred to as "Complaint."

2. Along with IRC, the Complaint names three other Defendants: Agouron Pharmaceuticals, Inc. ("Agouron"); Dennis J. Carlo ("Carlo"); and Ronald B. Moss ("Moss"). Except when distinguishing among the individual Defendants, the Court uses "Defendants" to refer to all Defendants collectively. All Defendants have filed Motions to Dismiss. IRC and Carlo have filed jointly. Moss and Carlo join in each other's Motions. Agouron filed its Motion separately. The Court uses "Motions" to refer to all motions collectively. The Order addresses all Motions together.

3. Plaintiffs "do not object to the exhibits lodged by Defendant Moss as those documents are specifically referenced in the Complaint." (Opp'n at 2, n. 1.)

Cir.2004); *see also Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1096 (9th Cir.2004) ("When ruling on a motion to dismiss, we accept all material allegations of a complaint and view them in the light most favorable to the plaintiff."). "Indeed, factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee*, 250 F.3d at 688.

■ "There are, however, two exceptions[.]" *Id.* Incorporation by reference is one exception. *See Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998). Under that exception, "a court may consider material which is properly submitted [or attached] as part of the complaint[.]" *Id.; see also Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir.1997), *superseded by statute on other grounds, see In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." *Lee*, 250 F.3d at 688. But, "this is a narrow exception . . . It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir.1998).

■ Then there is judicial notice. Under Fed.R.Evid. 201, "a court may take judicial notice of matters of public record." *Lee*, 250 F.3d at 688–89. "But a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Id.* at 689–690 (internal citation omitted).[4]

Here, Defendants seek to incorporate by reference twenty eight (28) documents,

twelve (12) of which—Exs. 1, 2, 3, 5, 6, 15, 16, 21, 23, 24 25, and F—Plaintiffs oppose. None of the opposed documents are central to, or form the basis of, Plaintiffs' claims. Moreover, the Complaint does not "extensively" refer to any of them; nor do Plaintiffs' claims necessarily rely on them. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003) ("[A] document . . . may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim."); *Lee*, 250 F.3d at 688. Rather, Defendants offer the documents as evidence that Defendants did not commit securities violation.

Also, considering these documents as part of the pleadings at this stage would expand the "narrow exception" and eliminate the distinction between a motion for summary judgment and a motion to dismiss. *See Levenstein*, 164 F.3d at 347. In other words, granting Defendants' requests would turn the proceedings into a summary judgment motion without invoking the normal consequences. *See In re Network Equip. Techs., Inc. Litig.*, 762 F.Supp. 1359, 1368 (N.D.Cal.1991) ("Court[s] should not . . . generate an evidentiary record and then weigh evidence . . . to dismiss [a] complaint."). Furthermore, consideration of the exhibits encourages a weighing of factual disputes; a process that is improper on a motion to dismiss. *See In re Northpoint Communications Group, Inc.*, 221 F.Supp.2d 1090, 1095 (N.D.Cal.2002). At this stage, the Court must resolve any ambiguities in Plaintiffs' favor. Accordingly, the Court denies Defendants' request and will not consider the opposed documents. *See Cooper*, 137 F.3d at 622–23.[5]

---

4. For example, "when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Lee*, 250 F.3d at 690.

5. In *Cooper*, the court excluded transcripts of conference calls, declarations, and a faxed

 Next, Defendants request judicial notice of seven (7) documents, four (4) of which—Exs. 4 and 13, G and H—Plaintiffs oppose. For the following reasons, Defendants' request is denied. "Courts may only take judicial notice of adjudicative facts that are not subject to reasonable dispute." *Ritchie*, 342 F.3d at 908–09. "Facts are indisputable, and thus subject to judicial notice, only if they either 'generally known' . . . or capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned[.]" *Id.* The contested exhibits are not the type of documents readily capable of judicial notice, and Plaintiffs contest their authenticity. There is no indication that Plaintiffs intentionally omitted material facts to disguise any deficiency in their claims. *See Parrino*, 146 F.3d at 706. Moreover, the Court did not rely on the documents and finds them irrelevant in deciding the Motions. *See Osher v. JNI Corp.*, 308 F.Supp.2d 1168, 1177 n. 2 (S.D.Cal.2004).

Having found that the exceptions do not apply, the Court's Review "on [this] motion to dismiss is limited to the contents of the [C]omplaint." *Pelletier*, 968 F.2d at 872. As noted above, the Court is "required to presume all factual allegations of the [C]omplaint to be true and draw all reasonable inferences in favor of the nonmoving party"the Plaintiffs. *LSL Biotechnologies*, 379 F.3d at 698. Regarding the unopposed documents, the Court will refer to them as it finds appropriate.

copy of internal projections, the substance of which were purportedly referenced in the complaint, when the defendants offered the same to show that the allegations were "outright falsehoods." *Cooper*, 137 F.3d at 623. The court stated that although the plaintiffs referenced conference calls in the complaint, they did not expressly mention or refer to the transcripts, or even identify their existence. *Id.* The court further noted that "the transcripts themselves apparently did not exist at

## Factual Background

For purposes of these Motions, the Court must construe the facts in a light most favorable to Plaintiffs. Accordingly, for the purpose of adjudicating the instant Motions to Dismiss, the Court assumes the following facts to be true.

### A. Defendants IRC, Moss and Carlo

IRC is a biopharmaceutical company that develops immune-based therapies for the treatment of HIV. (Compl.¶ 1.) IRC's stock is traded on NASDAQ. Defendant Dennis J. Carlo, Ph.D. ("Carlo"), is a co-founder of IRC and was its Chief Executive Officer during the Class Period. Defendant Dr. Ronald B. Moss ("Moss") was Director of Medical and Scientific Affairs until January 2000, and then was named Vice President of Medical and Scientific Affairs.

Moss and Carlo had the authority to control the contents of IRC's quarterly reports, press releases and presentations to securities analysts. They also had copies of IRC's reports and press releases before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or correct them.

IRC invented REMUNE in 1987 to treat HIV. To market REMUNE, IRC had to get approval from the Food and Drug Administration ("FDA"). In fact, every drug sold in the United States must first be approved by the FDA. Approval by the FDA requires preclinical trials, usually done on animals, then at least three

the time [the] plaintiffs filed their complaint; they first appeared as exhibits to [the defendant's] motion to dismiss, and they are accompanied by a declaration describing their transcription from tapes. *Id.* Further, [the] plaintiffs disputed the authenticity and accuracy of the transcripts in the district court, and objected to their use; they repeat those objections here. *Id.* The transcripts therefore cannot be considered in ruling on the motion to dismiss.

phases of clinical trials on humans; these trials are referred to as phases I, II, and III. Phase I trials are mainly aimed at determining if the metabolic and pharmacologic actions of the drug in humans are safe enough to proceed to Phase II studies. Phase II studies are controlled clinical studies that involve a limited population infected with the disease the drug proposes to treat. Phase III studies usually involve many more people than Phase II studies and are intended to gather additional information on the drug's efficacy and safety that will be used in evaluating its overall risks and benefits.

By 1996, IRC had completed phases I and II, which proved REMUNE had a positive effect on secondary markers such as CD4 cells.[6] But impact on secondary markers was not enough to obtain FDA approval. At phase III, IRC had to further show that REMUNE slowed the progression from HIV to Acquired Immune Deficiency Syndrome ("AIDS") or from AIDS to death. This was the only measure of efficacy in 1996.[7]

## B. Defendant Agouron and Study 806

In February 1996, IRC received clearance from the FDA to begin phase III studies of REMUNE ("Study 806"). Although IRC had other proprietary technologies, only REMUNE had advanced to Phase III testing. IRC accordingly issued

a press release entitled "The Immune Response Corporation Receives Clearance From Food And Drug Administration To Begin Phase III HIV Clinical Trial," which stated:

> The Immune Response Corporation announced today that its HIV treatment REMUNE(TM), formerly known as the HIV-1 Immunogen, has received clearance from the Food and Drug Administration to begin a large-scale Phase III clinical endpoint trial. This clinical trial is scheduled to begin during March in medical centers throughout the United States. This is the first HIV immune-based therapy to enter into a Phase III clinical trial and represents a major milestone for the company.

(Compl. ¶ 43.)

Study 806 was overseen by an independent Data Safety Monitoring Board ("DSMB"). Dr. James O. Kahn acted as the Study Chair and Dr. Stephen Lagakos as the Statistician. Dr. Lagakos' assessments were reported to the DSMB.

To fund Study 806, IRC collaborated with Agouron Pharmaceuticals, Inc., a wholly owned subsidiary of Pfizer, Inc. Agouron was the primary source of funds for development of REMUNE.[8] If regulatory approvals were received, IRC would manufacture commercial supplies of REMUNE. Agouron would then have exclusive rights to market REMUNE. The

---

**6.** "CD4 cells play a critical role in coordinating the body's immune response system, and the decline in their number causes corresponding deterioration of the body's ability to fight infections from many sources." *Bragdon v. Abbott,* 524 U.S. 624, 634, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

**7.** According to the Complaint, "[I]t has never been clearly proven that with immune-based therapies [such as REMUNE], the[ ] secondary or surrogate markers are acceptable substitutes for clear evidence of reduction in clinical disease progression of HIV. Therefore, in the setting of non-conventional immu-

nization therapies such as REMUNE, wholesale acceptance of secondary markers as proof of salutary clinical effects by themselves is not widely accepted as clear indication of clinical efficacy." (Compl. ¶ 54.)

**8.** "Over time, beginning in June 1998, Agouron would pay IRC license and milestone payments totaling $45 million and another $20 million to support development of REMUNE. By early 1999, IRC had received approximately $40 million in payments from Agouron." (Compl. ¶ 8.) Moreover, as part of its licensing agreement, Agouron held $20 million of IRC's stock. (*See* Compl. ¶¶ 40–41.)

companies agreed to share profits on a 50/50 basis.

At the start of Study 806, on March 18, 1996, IRC issued a press release entitled "First Patients Treated In Nationwide Clinical Trial Of HIV Therapy Proposed By Dr. Jonas Salk," which stated:

> A nationwide clinical trial starts today of a therapy that fights HIV by stimulating the immune system. This is the largest trial of such a treatment ever conducted. Up to 3,000 HIV-infected individuals will participate in this trial testing RE-MUNE(TM), a therapy proposed by Dr. Jonas Salk, who developed the first polio vaccine.
>
> This therapy could provide physicians with an entirely new weapon against HIV that complements the anti-HIV drugs now available. REMUNE works in combination with antiviral drugs to attack HIV, the virus which causes AIDS. Antiviral drugs get into infected cells to shut down the machinery that manufactures HIV. REMUNE is designed to direct the immune system to attack and kill these infected cells. These two complementary weapons may be important in the fight against HIV. REMUNE is the first treatment designed to stimulate the immune system of HIV-infected patients to move into an FDA approved Phase III trial, the final stage of clinical trials . . .
>
> "This clinical trial may become a model for future HIV therapy development. The trial is designed to allow patients to continue all current therapies including the new protease inhibitors and other approved HIV treatments," Dr. Lagakos said. "It will determine the ability of REMUNE to improve upon the current standard of care for HIV infection."

(Compl.¶ 47.)

Study 806 involved 2,500 patients enrolled from over 70 centers throughout the United States. It aimed to prove that there were "statistically significant" differences between the patients receiving placebos and the ones receiving REMUNE. Statistically significant denotes the threshold at which a drug is considered effective. For Study 806, the study design team defined statistical significance as meaning the group taking REMUNE showed a 50% greater AIDS-free survival rate, or generated an immune response at a 50% greater rate, than the group receiving placebos.

All patients in Study 806 were injected with either REMUNE or a placebo every twelve (12) weeks for a planned total of 13 injections. The patients injected with RE-MUNE were also injected with antiretroviral treatments ("ART") or highly active antiretroviral treatments ("HAART"). ART or HAART impede replication of the HIV virus, whereas REMUNE was supposed to stimulate the immune system to fight the HIV virus directly.

On May 12, 1997, IRC issued a press release entitled "The Immune Response Corporation Completes Enrollment of 2,500 Patient Phase III Clinical Trial of REMUNE(TM)," which stated:

> The Immune Response Corporation announced today that it has completed enrollment of its nationwide Phase III clinical trial of REMUNE, a therapy that fights HIV by stimulating the patient's own natural defense mechanisms against the virus. This is the largest trial of an HIV-specific immune-based therapy ever conducted in the U.S. and involves 2,500 HIV-infected individuals at 74 medical centers around the United States. The trial is designed to determine the effectiveness of REMUNE in slowing the progression of HIV infection to AIDS or death. REMUNE is the first treatment of its kind to advance to a Phase III clinical trial.

(Compl.¶ 48.)

As previously noted, the primary efficacy or "end point" in Study 806 was AIDS-

free survival, measured by the time it took for an HIV-positive patient to develop AIDS or for an AIDS-infected patient to die. But Study 806 also measured RE-MUNE's effect on secondary markers, e.g. CD4 cells and viral loads. CD4 cells are indicators of immune response. Viral loads identify the number of HIV-infected Ribonucleic Acid ("RNA") cells in a patient's bloodstream. Blood samples were taken from each of the 2,500 patients every 24 weeks to measure their CD4 cells and viral loads.

IRC also conducted a smaller sub-study of secondary markers, by randomly choosing 250 patients from the 2,500 patients selected for Study 806 ("250–Cohort Study"). IRC took blood samples from the 250 patients every 12 weeks to measure their CD4 cells and viral load. Data and analyses from the 250–Cohort Study were not part of Study 806's protocol.

### C. The 435 Sub–Study

By early 1999, it was determined that ART or HAART caused fewer patients than anticipated to reach Study 806's primary endpoint—AIDS-free survival or death. Thus, in March 1999, a 435 patient sub-study ("435 Sub–Study") was initiated. The 435 Sub–Study assessed whether RE-MUNE would decrease viral loads in a subset of 435 patients. The 435 Sub–Study's inquiry was more narrow than that of Study 806 which measured the progression from HIV to AIDS, or from AIDS to death. Drs. Lagakos and Kahn worked with Defendant Carlo on the proposals for the 435 Sub–Study. In March 1999, the DSMB approved the proposals. The DSMB's approval came before the DSMB had reviewed Study 806's results for secondary markers. In May 1999, the 435 Sub–Study showed that REMUNE had no effect on CD4 cells and viral loads.

### D. Study 806 Termination

In early May 1999, Dr. Lagakos—Study 806's statistician—met with the DSMB. The DSMB told Dr. Lagakos that it intended to terminate Study 806. Two reports were then prepared. The "open" report set forth the reasons for the DSMB's recommendation to terminate Study 806. It also set forth the overall viral load of the total patient population, the 435 Sub–Study results, and other secondary endpoints that were part of the study plan. The "closed" report included an appendix that was not attached to the "open" report. The appendix contained the data on the patients in the placebo and REMUNE groups as well as the clinical and secondary endpoints in each group.

On May 14, 1999, at a meeting in Chicago with one representative from Agouron and IRC representatives Moss and Carlo, the DSMB summarized its reasons for terminating Study 806. After the meeting, Dr. Lagakos gave the representatives a copy of the "closed" report with the appendix containing the codes necessary to "unblind" the data.

On May 15, 1999, the DSMB officially recommended termination of Study 806. The DSMB found it unlikely that Study 806 would yield REMUNE's primary efficacy or "endpoint"-patients who received REMUNE died or developed AIDS-related infections as often as those getting a placebo. DSMB also found that RE-MUNE had no effect on viral loads or CD4 cells.

Soon thereafter, Dr. Lagakos received several phone calls from IRC. Dr. Lagakos reported that IRC representatives, Carlo and Moss, "feverishly" reviewed the unblinded Study 806 data in search of some kind of positive impact on some types of patients. He also recalled that Carlo and Moss specifically relied on the viral load data from IRC's 250–Cohort Study. Dr.

Lagakos warned them not to "over-interpret" the data from IRC's 250–Cohort study since the more comprehensive study—Study 806—showed that RE-MUNE had no positive effect on viral loads.

Then, according to Plaintiffs, Defendants issued a series of press releases and Securities and Exchange Commission ("SEC") filings that were false or misleading. The first occurred on May 17, 1999, when IRC issued a press release entitled "Independent Panel Recommends Concluding Clinical Endpoint Trial of RE-MUNE; Agouron Pharmaceuticals, Inc. and The Immune Response Corporation To Pursue Alternative Regulatory Strategy," ("the Press Release"). The Press Release stated:

> The Immune Response Corporation and Agouron Pharmaceuticals, Inc. announced today that an independent Data Safety Monitoring Board (DSMB) completed a second interim analysis of the 2500–patient, placebo-controlled, Phase III clinical endpoint trial to evaluate the immune-based therapy REMUNE(TM) added to patients' other anti-HIV therapy. The DSMB recommended the trial be concluded at this time because differences in clinical endpoints were not observed between treatment groups and because extending the trial would be unlikely to provide sufficient additional clinical endpoints to permit statistically significant differences between the treatment groups to be observed in the near term.
>
> The number of HIV-associated clinical endpoints observed in the trial was far less than originally anticipated, which was believed to be the result of increasing use of Highly Active Antiretroviral Therapy (HAART) including HIV protease inhibitors, after the trial was initiated.

> The Immune Response Corporation and Agouron Pharmaceuticals, Inc. reported that separate analysis of a cohort of 250 patients randomly pre-selected for surrogate marker analysis, showed a significantly greater reduction in viral load (level of HIV RNA in plasma) after 48 and 96 weeks of treatment and significantly greater increases in lymphocyte proliferation in those who added RE-MUNE to their underlying anti-retroviral therapy, compared with those who did not. The Companies also reported that Agouron plans to initiate two additional phase III surrogate marker trials of REMUNE in light of an agreement previously reached with the Food and Drug Administration that an application for the marketing of REMUNE could be submitted based upon favorable virological endpoints.
>
> "While HAART, which became the standard of care after we initiated this trial, has been an enormous benefit to HIV patients, it has made it exceedingly difficult to conduct a trial based upon reaching clinical endpoints," according to Dennis J. Carlo, Ph.D., president and chief executive officer of The Immune Response Corporation. "The significant improvements in viral load and in lymphocyte proliferation observed in the REMUNE arm of the 250 patient cohort confirm previous results and provide support for a proposed rollover study for patients currently enrolled in the clinical endpoint study. This rollover study, which is planned to be initiated in the next 2–3 months after FDA clearance, is intended to evaluate the ability of patients to maintain viral load suppression after discontinuation of anti-retroviral drugs."
>
> "We believe the improved control of viral load observed in the clinical endpoint study provides strong support for new pivotal clinical trials of REMUNE to be

based on virologic markers," said Peter Johnson, Agouron's president and chief executive officer. "Concluding the clinical endpoint trial at this time also presents a unique opportunity to address a very contemporary question: can immune-based therapy extend the duration of the anti-HIV response induced by HAART under the most challenging conditions? The potential to produce this effect remains one of REMUNE's most important attributes."

(Compl.¶ 68.)

Plaintiffs allege that the Press Release was misleading as evidenced by the positive analyst reports that followed it. One analyst report noted that the drug still showed promise. Bloomberg reported on May 17, 1999:

> "It's a setback for them, clearly," said Alan Auerbach, an analyst with First Security Van Kasper. "Does it mean game over? I don't think so."
>
> Though the drug didn't appear to have any statistical effect on patient survival, the companies said an analysis of 250 of the 2,500 patients appeared to show a reduction in the level of HIV in the blood of REMUNE patients.

(Compl.¶ 70.) On May 18, 1999, Prudential Securities issued a report by C. Copithorne based on conversations with IRC management. The report rated IRC a strong buy:

> While not the primary endpoint of the study, the DSMB (Data Safety Monitoring Board) reviewed the affect [sic] of REMUNE on viral load in the trial. There were 250 patients (or about 10% of those enrolled) in the trial which were randomly preselected for more intense monitoring for surrogate marker analysis.
>
> Of the 250 patients analyzed, those in the arm treated with REMUNE in addition to HAART demonstrated a statistically significant reduction in viral load

compared to HAART alone, after both 48 and 96 weeks of treatment. While the detailed data will not be disclosed until they can be presented in a proper scientific forum, the reductions were highly statistically significant and were of a magnitude greater than that seen in the small Valentine study announced in 3Q 1998—in which 86% of the REMUNE/HAART patients had viral loads below 40 copies per milliliter versus 67% in the placebo/HAART arm (see note dated 10/26/98). These patients also had a greater increase in lymphoctye proliferation, consistent with that seen in long-term non-progressors.

(Compl.¶ 71.)

According to Plaintiffs, after the Press Release, IRC's stock declined to $7.56, but would have declined further had IRC not asserted that the 250–Cohort Study yielded "significant improvements" in patients using REMUNE. IRC's stock continued to trade in an inflated price of $5–$6 range through the summer of 1999.

Plaintiffs identify portions of the Press Release they claim were false or misleading. Plaintiffs first take issue with the following statement by Defendants' about DSMB's recommendation to terminate Study 806:

> because differences in clinical endpoints were not observed between treatment groups and because extending the trial would be unlikely to provide sufficient additional clinical endpoints to permit statistically significant differences between the treatment groups to be observed in the near term. The number of HIV-associated clinical endpoints observed in the trial was far less than originally anticipated, which was believed to be the result of increasing use of Highly Active Antiretroviral Therapy (HAART) including HIV protease inhibitors, after the trial was initiated.

(Excerpt from the May 17, 1999 Press Release.)

According to Plaintiffs, "Study 806 was terminated because it showed no significant difference between the REMUNE and placebo groups for the primary clinical endpoints or any of the numerous secondary clinical endpoints, including viral load and lymphocyte markers." (Compl.¶ 76.) Also, according to Plaintiffs, Dr. Lagakos "completely disagree[d]" that there were not enough endpoints from which to evaluate REMUNE's efficacy. Rather, Plaintiffs allege, REMUNE proved ineffective since 106 patients experienced disease progression or death during the three-year period in which Study 806 took place. (Compl.¶ 90.) "Furthermore, [Plaintiffs allege], HAART's impact on the number of clinical endpoints was not the reason that the DSMB recommended terminating Study 806. The trial was terminated because the primary and secondary clinical endpoint data from the REMUNE and placebo groups showed no difference between the two groups, i.e., no added benefit from REMUNE." (Compl.¶ 91.)

### E. The 250–Cohort Study

Plaintiffs next claim that IRC's statements about the results achieved in its separate study—the 250–Cohort Study—were misleading. In the May 17, 1999 Press Release, IRC claimed:

> separate analysis of a cohort of 250 patients . . . showed a significantly greater reduction in viral load . . . and significantly greater increases in lymphocyte proliferation in those who added REMUNE to their underlying anti-retroviral therapy, compared to those who did not.

According to Plaintiffs, the more comprehensive analysis of data from Study 806, which included 2,500 patients, showed no reduction in viral loads. Thus, Plaintiffs claim, IRC should have included the negative results from Study 806 in the Press Release. Plaintiffs next contend that the Press Release should have included language indicating that IRC's 250–Cohort Study was never intended to be used for a stand-alone analysis of viral load or any other secondary marker; the FDA would not have accepted the viral load secondary endpoint to show efficacy of REMUNE as clinical endpoints were the only acceptable measures of efficacy. According to Plaintiffs, the Press Release failed to disclose: (1) that the Study 806's team was not involved in the 250–Cohort Study; (2) that the 250–Cohort Study was done after Study 806 terminated; and (3) the results from the 435 Sub–Study, which showed that REMUNE had no effect on viral loads. (See Compl. ¶¶ 83–86.)

Plaintiffs also challenge the design and validity of IRC's 250–Cohort Study. According to Plaintiffs, a separate analysis of the viral load of only 10% of the 2,500 population was meaningless because it ignored the data for the remaining 90% of the patients, which showed no difference in viral load as a result of taking REMUNE. Also, according to Plaintiffs, the patients in the 250–Cohort Study had no specific biologic marker in common that was absent in the overall 2,500 patient population; both the cohort and the entire population were divided into REMUNE and placebo groups by random selection without regard to a common marker. The only difference between the 250–patient cohort and the total study population was the frequency of testing on the patients for certain biologic markers; test samples for patients in the 250–patient cohort were taken every 12 weeks while the total study population had test samples taken every 24 weeks. Dr. Lagakos said, "The frequency of testing does not change the biology of the product that we were trying measure[.]" (Compl.¶ 84.)

Prior to the publication of the Press Release, Plaintiffs claim, Drs. Kahn and Lagakos objected [9] to the internal analysis of the 250–Cohort Study because, among other things, it omitted the viral load analysis from Study 806, which used a method that IRC and the FDA had approved before the study began. (*See* Compl. ¶¶ 80–86.) Plaintiffs further claim that when Dr. Lagakos analyzed the data from the 250–Cohort Study, he determined there was no significant difference in the viral load of the group taking REMUNE with the placebo group. Dr. Lagakos, however, did not use IRC's multiple time point method for analyzing the viral load data due to the high chance of finding a false positive. Instead, he applied the same method used in Study 806, analyzing viral load data from all the time points when viral load samples were taken from the REMUNE and placebo groups, and then calculated an average for each group. Dr. Lagakos found no significant difference in viral load between the two groups in his analysis. Dr. Lagakos communicated these results to Chris Nardo, former head of IRC's Information Technology Department and Lead Data Analyst for IRC. Nardo acknowledged in a phone conversation with Dr. Lagakos that Dr. Lagakos' results indeed showed no significantly different viral load effect in the REMUNE group compared with the placebo group. (*See* Compl. ¶ 87.)

Lastly, Plaintiffs take issue with the portion of the Press Release where Carlo is quoted as saying: "[t]he significant improvements in viral load and in lymphocyte proliferation observed in the REMUNE arm of the 250 patient cohort confirm previous results and provide support for a proposed rollover study...intended to evaluate the ability of patients to maintain viral load suppression after discontinuation of anti-retroviral drugs." (Compl.¶ 88.) Plaintiffs allege this statement was false or misleading because "Study 806...showed that REMUNE had no impact on CD4 percentage or viral load." (*Id.* ¶ 89.)

### F. SEC Filing

On July 2, 1999, IRC filed a Form 8–K with the SEC ("Form 8–K"). Form 8–K stated:

> The Company reported on May 17, 1999, that the Independent Data Safety Monitoring Board ("DSMB") completed a second interim efficacy analysis of Trial 806 to evaluate the immune-based therapy REMUNE when used alone or in combination with other anti-HIV therapy. The primary efficacy endpoint for this clinical trial was disease progression to an AID's defining condition or death. The DSMB recommended that Trial 806 be concluded because differences in clinical endpoints were not observed between treatment groups and because ex-

9. Dr. Kahn objected to IRC's statement that the study was terminated because HAART decreased the number of clinical endpoints. Dr. Kahn also objected because the Press Release failed to disclose that Study 806 showed REMUNE had no effect on viral loads while highlighting 250–Cohort Study's positive results on viral load as if they were part of the formal results from Study 806. Also, according to Plaintiffs, Dr. Kahn believed the Press Release was "the lowest form of data dredging" as it put out positive statements on select data that were not part of the FDA-approved protocol for Study 806. Specifically, Dr.

Kahn believed the Press Release emphasized superficially positive data points over the efficacy of the drug on patients. The approved protocol involved reviewing and analyzing all data collected over time to calculate averages. IRC's finding of a positive reaction to REMUNE at specific points in time were only snapshots of data without regard to the overall effect over time. IRC provided no rationale for its approach or a justification for claiming the data were significant, nor was there any reasonable basis for believing snapshots in time hold any significance in the treatment of HIV/AIDS. (Compl.¶ 74.)

tending the trial would be unlikely to provide sufficient additional clinical endpoints to permit statistically significant differences between the treatment groups to be observed in the near term.

As part of the second interim analysis of Trial 806, the DSMB also reviewed surrogate marker data. This included some viral load data (level of HIV RNA in plasma) from a subset of 435 patients, consisting of patients who at the outset of the trial were taking Highly Active Anti–Retroviral Therapy ("HAART") and had low levels of viral load (baseline HIV–1 RNA less than 400 copies/mL). The data was based on samples drawn every six months, but also included some additional data from samples drawn every three months from a small number of these 435 patients. The DSMB determined that in this subset of patients there was no statistically significant difference in viral load between those taking HAART and those taking HAART with REMUNE. In addition, other surrogate marker data was analyzed by the DSMB and significant differences were observed with respect to lymphocyte proliferation and CD4 cell count. There are a large number of plasma samples that have not been tested for viral RNA. It is possible, that this additional information might provide alternative findings and the DSMB encouraged testing these specimens with additional analyses.

The Company also previously reported that a separate analysis by the Company and Agouron Pharmaceuticals, Inc. ("Agouron"), a wholly owned subsidiary of Warner–Lambert Company, of a cohort of 250 patients randomly pre-selected from Trial 806 for surrogate marker analysis, showed a significantly greater reduction in viral load after 48, 96 and 120 weeks of treatment and significantly greater increases in lymphocyte proliferation in those who received REMUNE

compared with those who did not. The data was based on samples drawn from the patients in the 250 patient cohort every three months. Since the 250 patient cohort was randomly pre-selected, the Company believes that it was representative of the 2,500 patients in the study and included both patients who were and were not using HAART at the outset of the trial and thus had varying viral load levels. The analysis of this 250–patient cohort was completed after the DSMB had reached its findings and was not reviewed by the DSMB. It is possible that the results can be used, in conjunction with other data, to support an application for the marketing of RE-MUNE in the U.S. This data has not yet been presented to the United States Food and Drug Administration ("FDA"), but the Company and Agouron plan on submitting the results to the FDA for its consideration.

The Company is considering additional analyses to better understand the disparate viral load findings between the different patient populations analyzed in Trial 806.

(Compl. ¶ 95.)

Plaintiffs allege the statements in the Form 8–K "were false or misleading because defendants reported the manipulated and meaningless results of their analysis of the [250–cohort Study] while not disclosing that the analysis from the entire 2,500–patient study showed no impact on viral load. Further, defendants' emphasis on their analysis falsely showing positive results mitigates the negative results of the [435 Sub-study] which showed REMUNE had no impact on viral load." (Compl. ¶ 96.)

## G. Additional REMUNE Studies

Plaintiffs next allege Defendants misled investors by telling them about new stud-

ies of REMUNE, which were much smaller and less comprehensive than Study 806. On September 27, 1999, IRC announced that a new clinical trial was initiated to "further evaluate the safety and efficacy of REMUNE." (Compl.¶ 104.) IRC also said that "[p]revious clinical studies 'suggested that when combination antiviral drug therapy is accompanied by...injections of REMUNE...improvements in immunologic markers and positive trends in virological markers of the response to HIV are observed.'" (Id.)

On November 3, 1999, IRC issued a press release entitled "The Immune Response Corporation Presents Data Suggesting That REMUNE May Have an Effect on the Control of HIV Infection," which stated:

The Immune Response Corporation announced today that data were presented at the Royal College of Physicians, London, England, showing that patients treated with REMUNE(TM), an immune-based therapy to treat HIV infection, exhibited a significant increase in lymphocyte proliferation (p<0.05) associated with a decrease in the amount of HIV RNA in the bloodstream (p<0.05), commonly referred to as viral load...

"This data would appear to support the premise on which REMUNE is based, that improved immune health may lead to the control of HIV infection[.]" ...

Viral load, or the amount of HIV RNA in the plasma (cell-free portion of the blood), is a very good indicator of disease progression in the body. "The lower the viral load, the more favorable the prognosis for the patient," Dr. Moss explained...

The data Dr. Moss presented were based on results from a recently concluded 120-week study that involved 2,500 HIV-infected individuals. Patients were allowed to follow any regimen of antiviral therapy and switch antiviral drugs as needed. In a random, preselected cohort (n=252), lymphocyte proliferation was significantly higher (p<0.05) for individuals who received Remune plus adjuvant (a general immune stimulant) compared to an adjuvant control group.

Following treatment with REMUNE, the data suggest that lymphocyte proliferative responses specifically against HIV may have been restored in these patients. Viral load was significantly lower (p<0.05) in Remune treated patients compared to the control group at multiple timepoints over the 120-week period. Additionally, there was a significant increase in CD4 cells (p<0.05) in patients treated with Remune.

"The patients in this study were allowed to follow any antiviral drug regimen and switch drugs as often as needed, a situation not typical of most clinical studies in which patients must follow a strictly prescribed regimen. The fact that we still observed significant decreases in viral load for patients treated with Remune against such a background of unrestricted drug therapy is very encouraging in its potential relevance to a real-life clinical situation," Dr. Moss commented.

"We are very pleased with these results that we believe support the scientific validity of REMUNE, our immune-based approach to combating HIV infection," said Dr. Dennis J. Carlo, President and CEO of The Immune Response Corporation[.]

(Compl.¶ 99.)

Plaintiffs allege these statements were false or misleading since Study 806 proved that REMUNE had no effect on viral load or other secondary markers. Specifically, Plaintiffs allege "these statements were completely contrary to the findings of Study 806—that there was little evidence

of a meaningful difference in clinical progression for the patients given REMUNE and the lack of any pre-specified meaningful effects on CD4 cell count, CD4 percentage and HIV RNA (viral load). In fact, the official Study 806 results, published a year later, would say that 'subjects randomized to REMUNE demonstrated no significant improvement compared to those randomized to placebo with respect to HIV RNA.'" (*Id.* ¶ 100.)

### 1. Study 905

In a press release issued on January 25, 2000, Defendant Carlo stated "[o]ur studies have consistently suggested that REMUNE enhances cell-mediated immunity specifically against HIV" and announced that another new study—Study 905—would be conducted at Cedars–Sinai Medical Center in Los Angeles. Study 905...also intended to measure REMUNE's effects on HIV-specific immune responses and secondary markers of disease progression including CD4 cell count and viral load. (Compl.¶ 105.)

Plaintiffs allege Carlo's statements were "false or misleading because previous clinical studies, specifically Study 806, showed that REMUNE did not enhance cell-mediated immunity against HIV, *e.g.*, there was no benefit on viral load. Furthermore, the surrogate immune responses contemplated in Study 905 [were] not widely viewed as acceptable substitutes for reduction in disease progression in the setting of immunologic therapies." (Compl.¶ 106.)

### 2. The Thai Study

According to Plaintiffs, IRC then initiated a Phase II clinical trial in Thailand ("Thai Study"). The Thai Study assessed whether HIV-infected and AIDS patients treated with REMUNE showed increased CD4 cell counts. (Compl.¶ 107.) The patients from the Thai Study received no form of treatment other than REMUNE. This was because at that time other accepted forms of HIV treatment, such as ART, were not widely available in Thailand. IRC issued several press releases about the results of the Thai Study, all of which Plaintiffs allege were false or misleading.

First, on February 23, 2000, IRC issued a press release entitled "The Immune Response Corporation Announces Results From A Phase II Clinical Trial of REMUNE in Thailand at The WHO–UNAIDS Vaccine Advisory Committee Meeting," which stated:

The Immune Response Corporation announced today that the results from a double blind placebo controlled trial of REMUNE(TM) alone versus adjuvant alone in 297 Thai HIV–1 infected subjects ... also showed a significant effect (P<0.05) on HIV specific immune function favoring the REMUNE treated group...

The primary endpoint for the trial was a change in CD4 helper T-cell counts (immune cells selectively destroyed by HIV). CD4 cell counts and viral load are currently the only two accepted, validated clinical markers for HIV infection. Better clinical outcomes have been associated with increases in CD4 cell counts and decreases in viral load.

The results suggested that there was a significant increase (P<0.05) in CD4 cell counts in the REMUNE treated group compared to the control group. In addition, both humoral (P<0.05) and cell-mediated (P<0.05) immune responses specifically against HIV were elevated in patients treated with REMUNE compared to controls...

Both treatment groups remained stable in viral load during the blinded period of the 40 week trial. Additional data on 68 of the subjects who continued to receive REMUNE alone revealed that

87% (59/68) remained stable or decreased in viral load by week 88[.]

(Compl.¶ 108.)

Then, on March 23, 2000, IRC issued a press release entitled "Recent Clinical Data Suggest that REMUNE May Help to Rebuild Immune System When Used Alone or in Combination With Antiviral Drugs Against AIDS Virus; Thai Investigators to Propose REMUNE Monotherapy as First Course of Treatment in HIV–Infected Individuals in Thailand," which stated:

> The Immune Response Corporation announced today that recent clinical data suggest that REMUNE(TM), its immune-based therapy to treat HIV infection, may induce HIV immunity when used as a combination therapy with other antiviral drugs or when used alone as a monotherapy . . . .
>
> An observation common to the multiple trials suggest that patients treated with REMUNE in combination with antiviral drug therapy mount strong CD4 helper T cell immune responses against HIV. In this study, 297 HIV–1 infected patients who had never taken antiviral drug therapy received either REMUNE or placebo during the 40–week trial period and were monitored for several indicators of immune health and disease progression. The primary measure of the number of CD4 helper T cells was significantly higher (P<0.05) in the REMUNE treatment group . . . .
>
> "While antiviral drug therapy has been very beneficial to HIV patients in keeping viral load in check, it has not generally proven to help rebuild the immune system, which is ravaged by the virus. A common theme among the trial results reported today suggests that REMUNE may help to restore immune function to these patients. In fact, it is the T helper cells—the very immune cells that are destroyed by the virus—

that appear to re-establish after treatment with REMUNE[.]" . . .

> He noted that 87% (59/68) of those patients tested 48 weeks after the trial's end had stable (39 patients) or significantly decreased (20 patients) amounts of HIV in the bloodstream, commonly referred to as viral load. Furthermore, the decrease or stabilization of viral load was associated with a sustained increase in number of CD4 helper T cells as well as increased body weight.
>
> "Several clinical parameters of immune health and disease progression assessed in this trial and during the follow-up period suggest that REMUNE alone may be a beneficial monotherapy in the treatment of HIV infection. This is particularly important for HIV patients who do not have access to antiviral drug therapy."

(Compl.¶ 109.)

Lastly, on July 14, 2000, IRC issued a press release, stating that it proposed " 'to Thai health authorities that REMUNE should be used as a first line therapy, with cost-effective antivirals added on for non-responding patients. The stability of these patients receiving REMUNE alone is comparable to that of clinical non-progressors.' " (Compl.¶ 110.)

Plaintiffs allege the press releases about the Thai Study were false or misleading since they failed to disclose: (1) "Study 806 with a significantly larger study population of 2500 patients and a three-year study period had already determined that REMUNE had no effect on CD4 cell counts and viral load"; (2) "the proposal IRC purportedly made to Thai health authorities that REMUNE be tested alone or with limited ART [was] misleading because REMUNE would never be considered by the FDA as a stand alone therapy"; (3) "Dr. Lagakos, who helped design the Thai Study and analyzed the trial data,

harshly criticized the Thai report as inaccurate calling it 'one of the most egregious examples of misusing data'... [as] the Thai doctor isolated only one of ten data points that were available...and [analyzed] it different than the agreed-upon study design"; and (4) "the positive claims surrounding the Thai study which was designed to complement Study 806 did not carry much credibility because it was conducted by a private medical group—Trinity Medical—which is both an investor in [IRC] and has a financial interest in the approval of REMUNE for use in Asia under a distribution agreement with IRC." (Compl.¶¶ 112, 113.)

### 3. Study 5057

On May 10, 2000, IRC announced another "new" Phase III clinical study—a 96–week trial conducted at New York University Medical Center known as Study 5057. Study 5057 aimed to prove that RE-MUNE, when added to ART or HAART, suppressed viral load levels longer than antiretroviral therapies alone. Study 5057's design and purpose was nearly identical to Study 806's 435 Sub–Study. (Compl.¶ 114.)

On May 10, 2000, IRC issued a press release entitled "The Immune Response Corporation and Agouron Announce the Initiation Of a Pivotal Clinical Trial of REMUNE(TM), an Investigational Immune–Based Therapy for the Treatment of HIV Infection; The Adult AIDS Clinical Trials Group (AACTG) to Conduct Multi-Center Trial," which stated:

> The Immune Response Corporation and Agouron Pharmaceuticals, Inc. today announced that a pivotal trial has been initiated to evaluate the safety and efficacy of the investigational product RE-MUNE(™) (HIV–1 Immunogen) in increasing durability of viral suppression for people infected with HIV, when added onto their current antiretroviral regimens...

> "Previous clinical studies have suggested that when combination antiviral drug therapy is accompanied by intramuscular injections of REMUNE administered once every three months, improvements in markers of the immune response to HIV and positive trends in virologic markers are observed," said Fred Valentine, M.D., of Bellevue Hospital, New York University Medical Center, and Protocol Chair of the newly initiated trial...

> The primary objective of this 96 week, randomized, double-blind, adjuvant-controlled study is to determine whether the addition of REMUNE to a regimen of potent, suppressive antiretroviral therapy delays the time to virologic relapse (defined as a predetermined level of HIV–1 RNA detected in the plasma)[.]

(Compl.¶ 115.)

Plaintiffs allege this statement was false or misleading. Plaintiffs rely on Dr. Kahn's statement that Study 5057 was "worthless" from the start because IRC was "trying to do the same study [435 Sub–Study] and get different results." Plaintiffs also allege the statement failed to disclose that Study 806 had already determined REMUNE had no impact on prolonging virologic suppression. Thus, Plaintiffs allege, IRC's Study 5057 was an intentional effort to mislead the public into believing that REMUNE was still a potentially viable treatment for suppressing HIV in virologically-suppressed patients. (Compl.¶ 116.)

According to Plaintiffs, IRC attempted to prevent Dr. Kahn from informing the Study 5057 researchers about the results of the 435 Sub-study. "IRC even tried to withhold the results of Study 806 from Study 5057's sponsor. And, in fact, the study's design team did not receive the final DSMB report on Study 806 and were

not aware of the negative results from the 435 Sub-study, until after Study 5057 enrollment began. Once these results were made available in late May or early June 2000, the National Institute of Health suspended patient enrollment." (*Id.*)

Some time between the May 10, 2000 announcement of Study 5057 and June 5, 2000, the study team for Study 5057 received the viral load data from Study 806. On June 5, 2000, after reviewing the data, the AACTG decided to suspend enrollment in Study 5057. IRC announced this decision on June 9, 2000 in a press release entitled "The Immune Response Corporation and Agouron Pharmaceuticals, Inc. Announce ACTG Study Update," which stated that the reason for suspension was a "change in protocol":

> The Immune Response Corporation and Agouron Pharmaceuticals, Inc. today announced that they have been informed by the AIDS Clinical Trials Group (ACTG) that enrollment in the 96 week, randomized, double-blind, adjuvant-controlled study, previously announced on May 10, 2000, has been halted while it reviews protocol changes...The study protocol team has also informed The Immune Response Corporation and Agouron Pharmaceuticals, Inc. that the revised study protocol is expected to be developed quickly.
>
> The study was designed to answer the scientific question of whether vaccine-induced immune responses could aid in the control of HIV, and the practical question of whether this intervention could prolong the efficacy of potent antiretroviral therapy.

(Compl.¶ 119.)

Plaintiffs allege the statement failed to disclose the actual reasons for halting the study, as well as the nature of the protocol changes to Study 5057's design and patient informed consent form. (Compl.¶ 122.) According to Plaintiffs, "Dr. Kahn ex-

plained that the so-called change in protocol was the DSMB's decision to revise the informed consent provision in the patient enrollment form to include a statement that a prior study (Study 806) evaluated REMUNE's effect on virologic suppression which was the focus of Study 5057, and the prior study showed no positive effects from REMUNE." (Compl.¶ 120.)

## H. IRC's Secondary Public Offering

On July 12, 2000, IRC issued a press release announcing a secondary offering of its stock. The press release entitled "The Immune Response Corporation Offers 2,400,000 Shares of Its Common Stock," stated:

> The Immune Response Corporation announced today that it has filed a supplement to its previously filed shelf registration statement with the Securities and Exchange Commission (SEC) for a public offering of 2,400,000 shares of its common stock (plus up to 360,000 additional shares to cover over-allotments, if any). The shares are being offered through First Security Van Kasper and Gruntal & Co., L.L.C.
>
> The Company plans to use substantially all of the net proceeds from the sale of the common stock to further its REMUNE(TM) manufacturing process scale-up, for product development, for working capital and other general corporate purposes.

(Compl.¶ 123.)

IRC filed a Prospectus and Registration Statement with the SEC. The Prospectus, which was signed by Defendant Carlo, stated:

> REMUNE is designed to stimulate an HIV-infected individual's immune system to attack HIV, the virus that causes AIDS. We believe that results from previous clinical trials demonstrate that REMUNE significantly boosts HIV-spe-

cific immune responses and may induce a positive virologic effect in HIV-infected individuals. Furthermore, we believe REMUNE stimulates the production of specific antiviral substances that naturally protect components of the immune system from HIV infection. Leading HIV clinical researchers have begun to recognize that in order to effectively stop or slow the progression of HIV to AIDS, therapies must stimulate HIV-specific cell mediated immune responses in infected individuals in addition to reducing viral load through the use of antiviral drugs. By utilizing an immune-based therapy such as REMUNE, in conjunction with existing antiviral drugs, it may be possible to boost the HIV infected individual's immune system against the virus, so that the virologic effect of antiviral drug therapy is prolonged and enhanced.

REMUNE is currently involved in multiple clinical trials. Together with our primary marketing partner, Agouron Pharmaceuticals, Inc., or Agouron, a Pfizer Inc. company, we have initiated a Phase 3 pivotal trial designed to evaluate whether REMUNE plus highly active antiretroviral therapy, HAART, delays virologic failure in HIV-infected individuals. We currently expect to obtain results by the end of 2001, subject to successful patient enrollment. The National Institutes of Health, or NIH, is currently redesigning and if it is implemented, a second phase 3 trial to evaluate whether REMUNE plus HAART delays virologic failure could commence. The AIDS Clinical Trial Group, conducting the study for the NIH, closed the trial after it was determined that it was unlikely that the administration of REMUNE in the context of the original trial with a sample size of 472 patients would effect a significant reduction in the time to virologic relapse. An ongoing 243 patient

pivotal HIV trial in Spain, scheduled to be completed in April 2001, is also evaluating the effectiveness of REMUNE in delaying virologic failure. The lead researcher of this study has recently released interim data that suggest that treatment with REMUNE may enhance the immune system's reserves of HIV-specific killer T cells...

REMUNE, unlike antiviral drugs, can induce an HIV specific response, which is now thought by numerous researchers to be important in controlling HIV replication. REMUNE has been administered to more than over 2,000 patients, has an excellent safety profile, is well tolerated and is easy to administer.

The fact that REMUNE reconstitutes HIV-specific immunity provides a unique niche for REMUNE to be utilized in combination with drug therapy to provide long-term management of disease. One goal of the combination REMUNE-drug approach is to prolong the impact of antiviral drug therapies on viral load by increasing the immune response to HIV-infected cells. If successful, a delay in drug resistance and a prolonged duration of low levels of virus in the blood coupled with an increase in the immune response to HIV could translate into clinical benefit.

(Compl.¶ 124.)

On August 11, 2000, IRC raised $15 million in its secondary public offering. Plaintiffs allege the statements in the Prospectus were false and misleading since "one month prior to the [IRC]'s secondary offering, Dr. Kahn, the director of Study 806, had provided IRC with a copy of the manuscript the Study 806 researchers had prepared which showed no evidence of clinical benefits for REMUNE."

## I. Dr. Kahn's Report

Dr. Kahn's manuscript said, there was a 'lack of evidence of a difference between

the [REMUNE] group and the control group with respect to clinical progression' and that such results were 'consistent with the lack of any prespecified meaningful effects on CD4 cell count, CD4 percentage, and HIV RNA.' 'The results of this trial failed to demonstrate that the addition of [REMUNE] to ART conferred any effect on HIV progression-free survival to that achievable by ART alone.' James O. Kahn, MD, Deborah Weng Cherng, MS, *et al.*, JAMA Vol. 284, No. 17 (Nov. 1, 2000). (Compl.¶ 125.)

On October 31, 2000, IRC filed an arbitration proceeding to prevent the publication of Dr. Kahn's manuscript, claiming that Dr. Kahn's report was confidential information which belonged to IRC. That same day, IRC issued a press release entitled "The Immune Response Corporation Announces Arbitration Proceedings And Dispute Over Exclusion of Clinical Investigators and Sponsor Comments In The Publication of Clinical Trial Data Of RE-MUNE(TM) (HIV–1 Immunogen)," which stated:

The Immune Response Corporation announced today that it had initiated binding arbitration proceedings in a disagreement with the University of California San Francisco (UCSF) and a member of its faculty, Dr. James Kahn. The principle basis for the arbitration is over the public disclosure of clinical data by Dr. Kahn, which the Company believes is subject to customary confidentiality under the terms of a Research Agreement and an Investigational Site Agreement. The Company also contests that Dr. Kahn excluded clinical investigators and sponsor comments in the publication of clinical trial data of REMUNE(TM) (HIV–1 Immunogen) from Study 806, which ended and was reported in May 1999.

The Company decided that involvement of a third party arbitrator under the terms of a Research Agreement and

an Investigational Site Agreement was a necessary measure to ensure that confidential clinical trial data from Study 806 of REMUNE would not be published until all parties, including all of the clinical investigators, had an opportunity to review and agree upon a manuscript to be submitted for publication...

As was previously announced by the Company on May 17, 1999, Study 806, a 2500–patient, placebo-controlled Phase III clinical trial of REMUNE, was concluded based on the recommendation of an independent Data Safety Monitoring Board (DSMB). The trial was concluded because differences in clinical endpoints were not observed between treatment groups and because extending the trial would have been unlikely to provide sufficient additional clinical endpoints to permit statistically significant differences between treatment groups to be observed in the near term. Before the study began, the predicted clinical endpoint event rate was 6% progression per year, meaning that 6% of 2,500 patients would progress to an AIDS defining condition or death each year. However, when the study was stopped, only 0.73% per year progressed using the original Centers for Disease Control AIDS-defining conditions.

"What is at issue here is that while an effect of REMUNE on 'clinical' endpoints was not demonstrated in Study 806, we still gained very important insight from data concerning the effects of REMUNE on viral load (the amount of HIV in the bloodstream). This viral load information has helped us to design subsequent clinical trials of REMUNE," said Dr. Moss...

Data from a random, pre-selected subset of 252 patients suggested that viral load was significantly lower (p<0.05) at multiple timepoints (Weeks 36, 48, 60, 84, 96 and 120) in REMUNE treated patients

compared to the control group. The reduction in virus correlated with the induction of cell-mediated responses (T cell help) against the virus...

"In the subset study, we observed that patients treated with REMUNE had lower viral loads and increased T cell help compared to the placebo group. This is important because these characteristics are typical for people with HIV that do not progress in their disease," said Dr. Moss. "We had tried to come to an agreement with Dr. Kahn to publish all the data and to let the clinical investigators have a chance to review the manuscript. However, the authors decided to submit a manuscript to a scientific journal without input from their colleagues who participated in the study...

"As the top patient-enrolling clinical investigator in Study 806, I am extremely disappointed that neither I nor the other investigators were given the opportunity to review the manuscript of this very important clinical trial before it was submitted for publication. This omission was particularly surprising given that I have worked with these authors on several projects in the past," said John L. Turner, M.D., at Graduate Hospital, Philadelphia, Pennsylvania. "The Company has informed me that the details of the virological sub-study will not be included in the manuscript to be submitted for publication, and I find this to be an egregious omission...

When Dr. Kahn informed the Company of his intent to publish data from Study 806 without incorporating a pre-planned substudy analysis, which other clinical investigators and the Company deemed essential for completeness, this reinforced the Company's decision to enter into arbitration.

At the time Study 806 began, clinical endpoints were the only measures of efficacy that were accepted by the FDA for approval of REMUNE. Since then, the FDA now allows viral load markers for licensure of biological products such as REMUNE. A Phase III pivotal trial of REMUNE was initiated in September 1999 that is testing endpoints based on viral load instead of progression to AIDS and death (clinical endpoints)."

(Compl. ¶ 129.)

Plaintiffs allege these statements were false since Study 806 with a significantly larger study population of 2500 patients and a three-year study period had already determined that REMUNE had no effect on CD4 cell counts and viral load. (Compl. ¶ 130.)

On November 1, 2000, the leaders of the Study 806 published an article in the Journal of American Medical Association ("JAMA"). According to the article,

The basis for the recommendation [to terminate Study 806] was the lack of evidence of a difference between the [REMUNE] group and the control group with respect to clinical progression and that continuation of the study was unlikely to lead to a demonstrable difference between the groups. The lack of a clinical difference was consistent with the lack of any prespecified meaningful effects on CD4 cell count, CD4 percentage, and HV RNA...

"The results of this trial failed to demonstrate that the addition of [REMUNE] to ART conferred any effect on HIV progression-free survival relative to that achievable by ART alone.

James O. Kahn, MD, Deborah Weng Cherng, MS, *et al.*, JAMA, Vol. 284, No. 17 (Nov. 1, 2000). (Compl. ¶¶ 77, 131.)

IRC's stock fell 24% after the JAMA article was published. However, according to Plaintiffs, the decline was less than it could have been due to IRC's aggressive campaign to dispute the report. IRC

called the findings incomplete and inaccurate, condemning the JAMA article as "tabloid journalism." Defendant Moss called it "a nice smear campaign" and said that "the truth in the long run will come out." "What is at issue here is that while an effect of REMUNE on "clinical" endpoints [death, infection or cancer] was not demonstrated ... we still gained very important insight from data concerning the effects of REMUNE on viral load[.]'" (Compl.¶ 131.)

On April 23, 2001, IRC issued a press release entitled "The Immune Response Corporation Announces Publication of Study Suggesting That REMUNE(TM) Induces HIV–1 Specific T Helper Immune Responses That Correlate With Control of Virus," which stated:

The Immune Response Corporation announced the publication of data today that suggest REMUNE(TM) (HIV–1 Immunogen), an investigational immune-based therapy, induces HIV specific (T helper cells) immune responses that correlate with control of virus (viral load, the amount of HIV in the bloodstream) in HIV-positive individuals. An analysis of a protocol defined random cohort from a Phase 3 study showed that patients treated with REMUNE demonstrated a statistically significant reduction in viral load at multiple time points throughout the trial, regardless of concomitant antiretroviral drug therapy...

Viral load was measured as HIV–1 plasma RNA levels every 12 weeks, more frequently than in other patients in the larger study (whose viral load was measured every 24 weeks). In the REMUNE treated group, a significantly greater decline in viral load ($p < 0.05$) at multiple time points was observed....

"Since many of these patients were taking potent antiretroviral drugs and were permitted to switch drugs ad lib, we expected to see a decrease in viral load in both the placebo group and the REMUNE group," said John Turner, M.D., of the Graduate Hospital (Philadelphia, PA) and principal author of the study. "The data indicate, however, that patients treated with REMUNE tended to exhibit an even greater decrease in viral load when compared to the placebo group. The random cohort was sampled every three months for viral load. I believe that it is possible that the less frequent viral load sampling on the larger cohort which was obtained every six months (including a majority of the 435 patients on potent antiretroviral therapies at the beginning of the study), where little difference between the treatment groups was observed, impacted on the ability to detect effects of immunization on viral load. This is most likely due to the multiple antiviral drug switching which occurred during this trial. Most importantly, there was a correlation between the induced HIV specific T helper immune responses and control of the amount of virus in the blood. These findings further support the plausibility of the results in the random cohort."...

The 252 HIV-positive individuals involved in the published study were a randomly selected subset from a larger 2500–patient, multi-center, double-blind, adjuvant-controlled Phase 3 clinical study begun in 1996...The trial was discontinued in May of 1999 when an independent data safety monitoring board determined that the trial would not reach statistical significance on the primary endpoints of progression to AIDS related illnesses or death .... The trial was designed for a 6% per year rate of progression to AIDS or death as endpoints. During the trial, because of the fewer than expected clinical events, the endpoint definition was modified to include non-AIDS defining events.

When the trial was stopped it was determined that the actual rate of progression to AIDS or deaths was <1% per year.

REMUNE is currently the subject of several clinical trials, including a Phase 2 trial being conducted in Spain and a Phase 3 trial sponsored by the Company's partner Agouron Pharmaceuticals, Inc. (a Pfizer company) to evaluate REMUNE's effect on viral load when administered in combination with potent antiviral drug therapy. Impact on viral load is now a measure of efficacy that is accepted by the Food and Drug Administration for approval of REMUNE. (Compl.¶ 132.)

Plaintiffs allege these statements were false since Study 806, with a significantly larger study population of 2500 patients and a three-year study period, had already determined that REMUNE had no effect on CD4 cell counts and viral load. (Compl.¶ 133.)

**J. Agouron Terminates Funding**

On July 6, 2001, Agouron announced that it terminated its collaboration with IRC. IRC issued a press release entitled "Agouron Pharmaceuticals, Inc. Terminates REMUNE(TM) Development Collaboration," which stated:

> The Immune Response Corporation announced today it has received notification of the termination by Agouron Pharmaceuticals, Inc. (a Pfizer company) of the continued development and commercialization of REMUNE(™) (HIV–1 Immunogen), an investigational immune-based therapy for the treatment of individuals infected with HIV. The Company will regain full rights in the U.S., Europe, Japan and certain other countries to REMUNE as a result of Agouron's decision to end the collaboration. Agouron has advised that it will cooperate with the Company to effect an order-ly transition of Agouron's development responsibilities to the Company.

(Compl.¶ 135.)

According to Plaintiffs, IRC's press release failed to disclose the true reason why Agouron terminated its support of REMUNE—that it was ineffective. On July 10, 2001, the end of the Class Period, Agouron said that it "was pulling out of their collaboration" because IRC had not produced "convincing evidence that REMUNE 'helps patients.' " Plaintiffs allege that Agouron's departure from REMUNE's development was a signal to the market that the Company was less than forthcoming about REMUNE's prospects. (Compl.¶¶ 136, 137.)

IRC's stock now trades between $2.00 and $3.00 per share. IRC's stock traded as high as $18.31 during the Class Period. (Compl.¶ 138.)

### Discussion

On July 10, 2001, an initial complaint was filed. On July 31, 2003, Plaintiffs filed the Amended Consolidated Complaint ("the Complaint"), alleging five causes of action. For the first and second causes of action, Plaintiffs allege violations of sections 11 and 12(a)(2) of the 1933 Act against IRC and Carlo. Plaintiffs' first and second causes of action are based on the Registration Statement IRC filed for its secondary public offering in August 2000. Plaintiffs' third cause of action alleges control liability under section 15 of the 1933 Act against IRC, Moss and Carlo. For their fourth cause of action, Plaintiffs allege violations of section 10(b) and rule 10b–5 under the 1934 Act against all Defendants. Lastly, Plaintiffs allege control liability under section 20(a) of the 1934 Act against IRC, Carlo and Moss.

All Defendants move to dismiss the Complaint on various grounds. Having reviewed all arguments, the Court makes

the following findings. Plaintiffs adequately state a claim under section 10(b) and rule 10b–5 of the 1934 Act, and this claim is not time barred. However, Defendants' liability under section 10(b) and rule 10b–5 is individual—each Defendant's liability is limited to the alleged false and misleading statements he or it made. Plaintiffs also adequately state a claim for control liability under section 20(a) of the 1934 Act. Moreover, Defendants cannot establish a truth-on-the-market defense and, Defendant Agouron is not protected by the PSLRA safe harbor provision. Additionally, Plaintiffs adequately allege claims under sections 11 and 12(a)(2) of the 1933 Act plus a claim for control liability under section 15 of the 1933 Act. The Court's reasoning is set forth below.

## A. The 1934 Securities Exchange Act

### 1. Section 10(b) and Rule 10b–5 Claim

#### a. Whether Plaintiffs State Viable Claim

##### (i) Legal Standard

All Defendants move to dismiss Plaintiffs' section 10(b) and rule 10b–5 claim under Fed.R.Civ.P. 12(b)(6). "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001); *see also Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."). "A claim may be dismissed only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* (internal citations omitted).

Under this standard, the Court's review is limited. Even if the face of the pleadings indicate that recovery is very remote and unlikely, Plaintiffs are still entitled to offer evidence to support their claims. *See U.S. v. Redwood City,* 640 F.2d 963, 966 (9th Cir.1981); *see also Langford v. Atlantic City,* 235 F.3d 845, 847 (3d Cir.2000) (The issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims."); *Phelps v. Kapnolas,* 308 F.3d 180, 184–85 (2d Cir.2002) ("Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test."). However, it is not "proper to assume that [a plaintiff] can prove the facts it has not alleged or that the defendants have violated [laws] in ways that have not been alleged." *Associated Gen. Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Against this backdrop, for the reasons discussed below, the Court finds that Plaintiffs sufficiently state a claim under section 10(b) and rule 10b–5.

##### (ii) General Pleading Requirements

■ Section 10(b) makes it unlawful for: any person ... to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary[.]

15 U.S.C. § 78j(b).[10] "Rule 10b–5 is the regulation promulgated under Section 10(b)." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1229 (9th Cir.2004). Rule 10b–5, codified at 17 C.F.R. § 240.10b–5, implements section 10(b) by prohibiting fraudulent con-

---

10. One objective underlying the enactment of § 10(b) following the 1929 stock market crash was "to insure honest securities markets and thereby promote investor confidence." *U.S. v. O'Hagan,* 521 U.S. 642, 658, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997).

duct and misrepresentations and omissions of material facts in the purchase or sale of securities. Specifically, it provides that "it is unlawful to use any facility of the national securities exchange '[t]o employ any device, scheme, or artifice to defraud.' " *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 932 (9th Cir. 2003) (quoting 17 C.F.R. § 240.10b–5(a)). "It further provides that it is unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *Id.* (quoting § 240.10b–5(b)). To plead a case under section 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages." *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996).

In 1995, "Congress enacted PSLRA." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 (9th Cir.1999). "PSLRA...applies to private class actions.[.]" *Id.* The PSLRA "imposes a heightened pleading standard for alleging violations under the Securities Exchange Act of 1934." *In re Read–Rite Corp.*, 335 F.3d 843, 845–846 (9th Cir.2003); *see also Desaigoudar v. Meyercord,* 223 F.3d 1020, 1021 (9th Cir.2000) ("[T]he

PSLRA...modified the liberal, notice pleading standard found in the Federal Rules of Civil Procedure," such that the courts "now examine a securities fraud complaint to determine whether the plaintiff has complied with the more stringent pleading standards of the PSLRA."). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.' " *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 –1085 (9th Cir.2002).

### (iii) Pleading Falsity and Scienter

"Before the passage of the PSLRA, the pleading requirements in private securities fraud litigation were governed by Fed. R.Civ.P. 9(b), which required only that 'falsity' be pled with particularity; scienter could be averred generally. The Private Securities Litigation Reform Act of 1995 ("PSLRA") changed the pleading requirements...by requiring that a complaint plead with particularity both falsity and scienter." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1034 (9th Cir.2002).[11]

 "Falsity" is any "untrue statement of a material fact." 15 U.S.C. § 78u–4(b)(1). It also occurs when a defendant "omitted to state a material fact necessary in order to make the statements made, in

11. Specifically, the PSLRA imposes at least two pleading requirements on securities actions, referred to as paragraph (b)(1) and paragraph (b)(2). Paragraph (b)(1) applies to securities claims "in which the plaintiff alleges that the defendant" either "made an untrue statement of a material fact" or "omitted to state a material fact." 15 U.S.C. § 78u–4(b)(1). Paragraph (b)(2) applies to claims "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u–4(b)(2). The requirements of the PSLRA must be read consistently with its purpose. *See Barrett v. Van Pelt,* 268 U.S. 85,

90–91, 45 S.Ct. 437, 69 L.Ed. 857(1925). Congress enacted the information and belief pleading requirement because "[n]aming a party in a civil suit for fraud is a serious matter. Unwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress." H.R. Conf. Rep. 104–369, 1995 U.S. Code Cong. & Admin News 1995, at pp. 730, 740, at 41. The purpose of the information and belief requirement—indeed, the purpose of all of the PSLRA's heightened pleading requirements—was to weed out meritless lawsuits at the pleading stage.

light of the circumstances in which they were made, not misleading." *Id.; see also In re Milestone Scientific Secs. Litig.*, 103 F.Supp.2d 425, 460 (D.N.J.2000) ("A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it."). "Materially misleading statements or omissions by a defendant constitute the primary element of a section 10(b) and rule 10b–5 cause of action." *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1305 (C.D.Cal.1996).

■■■■ To plead falsity with particularity, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *In re Vantive*, 283 F.3d 1079, 1085 (9th Cir.2002); 15 U.S.C. § 78u–4(b)(1). If allegations are made on information and belief,[12] "a plaintiff must provide, in great detail, all the relevant facts forming the basis for her relief." *In re Silicon Graphics*, 183 F.3d at 985; *see also* 15 U.S.C. § 78u–4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."). "If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete." *In re Vantive*, 283 F.3d at 1085.

■■■■ Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *In re Silicon Graphics*, 183 F.3d 970, 975 (9th Cir.1999) (internal citations omitted). "[T]he PSLRA requires that the Complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, or scienter." *Nursing Home Pension*, 380 F.3d at 1230; 15 U.S.C. § 78u–4(b)(2); *see also In re Sil-*

*icon Graphics*, 183 F.3d at 975 ("The 'required state of mind' in § 78u–4(b)(2) refers to the scienter[.]"); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud."). This requires pleading "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics*, 183 F.3d at 974; *see also Nursing Home Pension*, 380 F.3d at 1230 ("The required state of mind is one of 'deliberate recklessness.' Recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct.").

■■■■ Great detail means a plaintiff "must provide a list of all relevant circumstances in great detail." *Id.* at 984. Deliberate recklessness or conscious misconduct may involve a "highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir.2002). "To allege a 'strong inference of deliberate recklessness,' plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." *Id.; see also Lipton*, 284 F.3d at 1035 ("[P]laintiffs who plead the required state of mind in general terms of mere 'motive and opportunity' or 'recklessness' fail to meet the PSLRA's heightened pleading requirements.").

---

12. "Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have personal knowledge of the facts." *In re Vantive*, 283 F.3d 1079, 1085 (9th Cir.2002).

"Scienter is [the] essential element of a § 10(b) claim." *In re Read–Rite Corp.,* 335 F.3d 843, 846 (9th Cir.2003); *see also Lipton,* 284 F.3d 1027, 1035 n. 15 (9th Cir.2002) ("Scienter is an essential element of a § 10(b) or Rule 10b–5 claim."). "In assessing whether Plaintiffs have sufficiently pled scienter [the Court] must consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home Pension,* 380 F.3d at 1230; *see also No. 84 Employer–Teamster,* 320 F.3d at 932 (The court "must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements."). "In determining whether a strong inference of scienter exists, [the Court] must consider all reasonable inferences, whether or not favorable to the plaintiff." *Id.; see also Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (noting the "inevitable tension...between the customary latitude granted the plaintiff on a [12(b)(6)] motion to dismiss...and the heightened pleading standard set forth under the PSLRA"); *see also No. 84 Employer–Teamster,* 320 F.3d at 945 ("In sum, although recognizing that some of Plaintiffs' allegations are individually lacking, we hold that the allegations in their totality are sufficient to meet the stringent pleading standard set forth in the PSLRA.").

"Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference of scienter, a Rule 12(b)(6) dismissal is proper." *Lipton,* 284 F.3d at 1035; *see also No. 84 Employer–Teamster,* 320 F.3d at 931–32 ("If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, his or her complaint must be dismissed.").

In sum, "the [C]omplaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir.2001). "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the complaint must be dismissed." *In re Syncor Intern. Corp. Sec. Litig.,* 327 F.Supp.2d 1149, 1156 (C.D.Cal. 2004). However, "[a]lthough pleading securities fraud after the PSLRA can no longer be described as merely 'notice pleading,' courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws." *In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 988 (D.Ariz.1999); *see also Ernst & Ernst,* 425 U.S. at 200, 96 S.Ct. 1375. In particular, whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact. *See Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir.1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir.1996).

### (iv) Whether Plaintiffs Adequately Allege Falsity and Scienter

Defendants challenge Plaintiffs' claims on elements one and three. Specifically, Defendants argue that Plaintiffs fail to adequately allege the falsity of Defendants' statements and that Defendants' knew such falsity, in accordance with PSLRA requirements. The Court disagrees.

"[F]alsity and scienter are generally inferred from the same set of facts."

*In re Read–Rite Corp.*, 335 F.3d 843, 845 (9th Cir.2003). Thus, Ninth Circuit decisional authority provides that "these two requirements may be combined into a unitary inquiry under the PSLRA." *Ronconi*, 253 F.3d at 429 ("Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u–4(b)(1) and (b)(2) into a single inquiry."). As noted above, to adequately plead falsity, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Plaintiffs have satisfied these requirements.

 The alleged misrepresentations and omissions are set forth in detail in the factual summary of the Complaint. Plaintiffs cite at least sixteen separate statements, SEC filings, and news releases which allegedly contain misrepresentations. Plaintiffs do not allege that any of these statements were objectively false. Rather, for the most part, Plaintiffs claim that the statements were misleading because they omitted crucial material information. The Court need not restate every false or misleading statement alleged. Suffice it to say that the crux of Plaintiffs' claim is that Defendants continuously misrepresented REMUNE's efficacy in treating HIV or its likelihood of receiving FDA approval, and suggested that no significant issues posed a threat. Plaintiffs do not allege that Defendants' public statements were knowingly false in the sense that they reported fictional clinical findings supporting REMUNE's efficacy. Rather, Plaintiffs allege that Defendants committed fraud by publicly reporting results that they knew or should have known were either so incomplete or so statistically flawed as to lack clinical significance. In other words, Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light. Whether Defendants' statements were accurate is not an issue at this stage. *See Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir.1993) (explaining, in reversing dismissal of a securities fraud complaint alleging deceptive corporate statements, "[w]hether the statements here were true or false is not an issue to be decided under Rule 12(b)(6)").

In addition, having explicitly identified the specific material misstatements and omissions alleged, for each misstatement or omission, Plaintiffs state grounds for finding them misleading. Moreover, for each misstatement or omission, Plaintiffs have stated the reasons why they believe these statements and omissions are misleading. Plaintiffs also include corroborating details of the internal reports, cite to specific reports, mention the dates or contents of reports and allege their sources of information about the reports. In other words, Plaintiffs have alleged with particularity statements that were false and/or misleading when made. They have also demonstrated contemporaneous facts which suggest the falsity of Defendants' statements. *See In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc) (A complaint may satisfy falsity by "pointing to inconsistent contemporaneous statements or information...which were made by or available to the defendants."); *see also Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 735 (E.D.Va.2003) ("The Court finds that this allegation is pled with enough specificity because Plaintiffs provide the reasons the statement is false and state with particularity the facts underlying the misrepresentation.").

Plaintiffs therefore satisfy 15 U.S.C. § 78u–4(b)(1)'s mandate to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." Additionally, Plaintiffs have not generally averred that the public statements were misleading; nor are the proffered reasons speculative or vague. Rather, Plaintiffs have pointed to specific elements of each statement and then provided reasonable explanations as to why they believe specific statements or omissions were false or misleading. The specific references to news articles, SEC filings, and press releases are sufficiently particular, and that is all that the PSLRA requires. *See Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 2 F.Supp.2d 1345, 1354 (D.Colo.1998) ("Neither Rule 9(b) nor the Reform Act require that Plaintiffs do more."). Plaintiffs likewise identify the substance of the false or misleading statements and plead the corroborating details indicating how, when, and under what circumstances the statements were communicated to the public. *See In re Secure Computing Corp. Sec. Litig.,* 184 F.Supp.2d 980, 990 (N.D.Cal. 2001). Therefore, Plaintiffs have clearly served the PSLRA's purpose by putting Defendants on notice of the specific misstatements and omissions at issue. *See Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997) ("Overall, the complaint identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer.").

 Plaintiffs also present factual allegations tending to contradict Defendants' optimistic statements about REMUNE's effect on secondary markers. See *Fecht,* 70 F.3d at 1083 ("[A]llegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false."); *In re GlenFed,* 42 F.3d at 1551 ("[P]laintiffs have pointed to specific problems which they allege undermined defendants' optimistic claims ... Thus this case ... is distinguishable from those cases ... in which plaintiffs stated simply that defendants' public statements were false, without explaining how they were false."). Specifically, Plaintiffs allege that both Study 806 and the 435 Sub–Study both proved that REMUNE had no effect on secondary markers, while Defendants repeatedly assured the public otherwise. Defendants' assurances, Plaintiffs allege, came from study results that they knew or should have known were either so incomplete or so statistically flawed as to lack clinical significance. *See Amylin Pharmaceuticals,* 2003 WL 21500525 at *8 (S.D.Cal.2003) ("[T]he concerns raised by the FDA ... were much more significant than a 'bump on the road' and shed serious doubt on the sufficiency of the trials. Accordingly, Defendants were obligated to disclose the FDA's concerns to render their statement not misleading."). Plaintiffs may establish falsity by alleging facts demonstrating "that the statements failed to reflect the [drug's] true condition at the time the statements were made." *Fecht,* 70 F.3d at 1083. Further, "allegations of specific problems undermining a defendant's optimistic claims suffice to explain how the claims are false." *Id.; see also In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 926 (9th Cir.1996) ("Optimistic statements may constitute a basis for a claim under Section 10(b).").

 Whether Defendants had to predict the efficacy of REMUNE is irrelevant. Defendants are liable under section 10(b) and rule 10b–5 if they made misstatements that a reasonable investor would consider in deciding whether to buy IRC's stock. "[A] fact is material if there is a 'substantial likelihood' that a reasonable investor would consider it important in his or her decision making." *No. 84 Employer–Teamster,* 320 F.3d 920, 934 (9th Cir.2003) (internal citations omitted). Moreover, "there must be a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. In other words, materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.; see also Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (A fact is material if there is a substantial likelihood "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

All investing is based to some degree on investors' perceptions about the future. Plaintiffs presumably bought IRC securities based on their perception of whether REMUNE would have a positive effect on treating HIV and/or be approved by the FDA. Defendants would not be responsible if its investors' perceptions were based solely on Defendants' predictions about the prospects of REMUNE's efficacy or FDA approval. That is not the case, however. Rather, Plaintiffs allege that Defendants' misstatements of fact formed a false basis for its investors' perceptions. "[T]he disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lindelow v. Hill,* 2001 WL 830956 at \*3 (N.D.Ill.2001). Where negative clinical study results are fully available to the market, investors can better weigh positive predictions, and securities are more accurately valued. If, as Plaintiffs allege, Study 806 and its sub-study had shown that REMUNE had no positive effect on secondary markers, then such information would "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978.

The Ninth Circuit's decision in *Warshaw,* 74 F.3d 955 (9th Cir.1996) is instructive. There, the court held that the plaintiffs' complaint easily survived a motion to dismiss. In *Warshaw,* the plaintiff-investors alleged that: Xoma Corp. assured them that their principal product, E5, was in perfect shape with respect to safety and FDA approval. But E5 turned out to be useless and was never approved by the FDA. Consequently, Xoma stock lost most of its value. The Court held that:

> The Complaint alleges several optimistic public statements made by Xoma, its officers, the press, and securities analysts, between the dates of March 2, 1992 and June 4, 1992. The Complaint asserts that the defendants knew that the facts contravened their "optimistic" statements that E5 was safe, effective, and would be approved by the FDA. In this case, we easily conclude that the Complaint satisfied Rule 9(b) requirements.

*Id.* at 960.

█ Defendants, however, argue that the failure to disclose efficacy data that was not considered fatal by various scientists, or was otherwise subject to scientific dispute, does not render alleged statements materially misleading. In making this argument, Defendants are asking the Court to make a factual determination. At a later stage, the issue of the reasonableness of Defendants' belief in their statements may be more appropriately raised. At this stage, however, it is simply not within the Court's authority to make such determinations. "Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact." *Fecht,* 70 F.3d at 1081. "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss

under 12(b)(6)." *Warshaw,* 74 F.3d at 959. The Complaint sets forth public statements and omissions that reasonable jurors could find to be materially misleading.

Considered as a whole, the Complaint also adequately pleads scienter. *See In re Silicon Graphics,* 183 F.3d at 985 (In a motion to dismiss, courts must consider "the larger question of whether [the] complaint, considered in its entirety, states facts which give rise to a strong inference of deliberate recklessness."). "Scienter can be established by direct or circumstantial evidence." *Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir.1996). The Complaint alleges facts that would support an inference that IRC's more optimistic predictions were known to be false or misleading. The Complaint then alleges that Defendants had knowledge of the circumstances concerning REMUNE's ineffectiveness on treatment of HIV and/or secondary markers. The Complaint also points to meetings and articles where such problems were discussed. Plaintiffs allege what was disclosed at those meetings, who disclosed what information, or when each issue was disclosed. *See In re Silicon Graphics,* 183 F.3d at 984 (finding that to allege communications informed defendants of facts rendering statements false, plaintiff must allege time, place, parties, and the sources from which information was gleaned about the communications). Moreover, plaintiffs allege the existence of contemporaneous documentary or testimonial evidence corroborating their allegations of what Defendants knew. Plaintiffs also contend that Defendants had access to contrary facts and specifically identify the reports or statements containing this infor-mation. *See Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000). "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002); *see also Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 665 (8th Cir.2001); *Novak,* 216 F.3d 300, 308 (2d Cir.2000); *Kaplan v. Rose,* 49 F.3d 1363, 1375–80 (9th Cir.1994) (failing to disclose known disappointing trial results while releasing positive statements regarding the product was sufficient evidence of scienter to raise genuine issue of material fact on summary judgment).

In *Silicon Graphics,* the Ninth Circuit found that while the plaintiff's complaint "suggest[ed] an inference of deliberate recklessness," it lacked "sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA." *In re Silicon Graphics,* 183 F.3d at 984–85. The complaint provided few specifics about the negative internal reports, and made a conclusory allegation that defendants held meetings at which they agreed to enter into a "conspiracy of silence" to minimize the company's problems in dealings with the public. Individual allegations were not attributed to particular sources. Instead, the complaint contained one paragraph stating that the plaintiff's counsel had conducted an investigation which included reviewing SEC filings, analyst reports and advisories, the company's press releases, and media coverage of the company, and possibly conducting interviews with stock analysts.[13]

---

**13.** The exact statement in the *Silicon Graphics* complaint read:

Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and adviso-ries about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations [ ]

The Ninth Circuit held that this complaint did not satisfy PSLRA's pleading requirement:

> [A] plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim. In this case, [plaintiff]'s complaint does not include adequate corroborating details. She does not mention, for instance, the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them. Nor does she include an adequate description of their contents which we believe-if they did exist-would include countless specifics regarding ASIC chip shortages, volume shortages, negative financial projections, and so on. We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability... [Plaintiff] would have us speculate as to the basis for the allegations about the reports, the severity of the problems, and the knowledge of the officers. We decline to do so.

*In re Silicon Graphics,* 183 F.3d at 985.

The present matter differs significantly in its facts. The plaintiffs in *Silicon Graphics* failed to plead information, much less specific sources, with sufficient particularity. In this case, however, Plaintiffs have made specific factual allegations including the names of persons involved in the alleged fraud, the reports which evidence the alleged fraud, and the actions of Defendants in perpetuating the alleged fraud.

■ Scienter may also be established by alleging facts to show that Defendants had a motive to commit fraud. As noted above, Plaintiffs allege that Defendants knowingly or recklessly made reassuring statements about the efficacy of RE-MUNE on secondary markers in the absence of complete data, and that they knew or should have known that FDA approval, at least in the projected time frame, was highly improbable. Defendants' motive, according to Plaintiffs, was to obtain continuing financing. Although IRC had other proprietary technologies, only RE-MUNE advanced to the Phase III testing-the stage of being considered for FDA approval. To date, IRC has not received approval from the FDA for REMUNE. IRC's continued prosperity depended on the approval of REMUNE.

■ Moreover, and contrary to Agouron's contention, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. *Novak,* 216 F.3d at 314; *see also In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir.2001) ("Even with the heightened pleading standard under Rule

---

after a reasonable opportunity for discovery.

Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consul-

tants, and believe that substantial evidentiary support will exist for the allegations [ ] after a reasonable opportunity for discovery.

183 F.3d at 985 (Alteration in original opinion). The district court in *Silicon Graphics* noted that the plaintiff's firm had submitted five complaints with virtually identical "boilerplate" allegations.

9(b) and the Securities Reform Act [PSLRA] [courts] do not require the pleading of detailed evidentiary matter in securities litigation.").

Taken as a whole, the allegations of the Complaint give rise to a strong inference of scienter with regard to the individual Defendants. Since the Complaint adequately pleads scienter, it is imputed to the Company. *See Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435 (9th Cir.1995). Moreover, having considered the parties' arguments and the Complaint and scrutinized the allegations in light of the pleading requirements of section 10(b), the Court finds that when read in its entirety, the Complaint satisfies the PSLRA's falsity and scienter pleading requirements.

#### b. Loss Causation

■ Agouron argues that the "Complaint fails to adequately plead loss causation [.]" [14] (Mot. at 21.) In other words, Agouron claims that the Complaint lacks allegations establishing a causal relationship between the improper acts with which Defendants are charged and Plaintiffs alleged economic losses.

■ The United States Supreme Court has recently reversed well-established Ninth Circuit case law regarding what is required to withstand a motion to dismiss on this issue. Previously, to plead causation in the Ninth Circuit, a plaintiff claiming section 10(b) and rule 10b-5 securities fraud merely had to allege and ultimately prove that the price of the security on the date of purchase was inflated because of the misrepresentation. *See Broudo v. Dura Pharmaceuticals, Inc.,* 339 F.3d 933, 938 (9th Cir.2003). However, the Supreme Court, noting that the Ninth Circuit's rule contravened that of several other circuits, found that such a rule fails to ensure actual causation in all cases. *Dura,* ― U.S. ―, ― ― ―, 125 S.Ct. 1627, 1630-31, 161 L.Ed.2d 577 (2005). For example, where the plaintiffs sold their stock immediately after purchasing it at an inflated price, before the truth was revealed to the market, the plaintiffs may have suffered no economic loss at all. *Id.* at 1631. Alternatively, where the price deflates before the plaintiffs sell their shares, the deflation may be caused by other factors aside from the misrepresentation's widespread discovery. *Id.* As such, the Supreme Court concluded that a plaintiff must do more that allege purchase price inflation. Addition-

---

**14.** On May 10, 2005 and May 20, 2005, respectively, Carlo/IRC and Moss filed *Ex Parte* Applications (1) for leave to join in Agouron's Motion to Dismiss and (2) asking the Court to consider new authority. [Doc. Nos. 84, 93.] The Applications are unopposed. Because the Motions to Dismiss were taken under submission several months ago, the Court declines to permit joinder at this time. However, it seems that these Defendants are particularly concerned with the loss causation issue raised in Agouron's Motion. Moss, Carlo and IRC claim that in light of case law as it existed at the time their Motions were filed, they did not believe a loss causation challenge to have merit as applied to this case. Because a recent Supreme Court case, *Dura Pharmaceuticals, Inc. v. Broudo,* ― U.S. ―, 125 S.Ct. 1627, 161 L.Ed.2d 577

(April 19, 2005), has reversed the Ninth Circuit on this issue, the Court will evaluate the merits of this defense as it applies to all Defendants. Moreover, the Court will consider *Dura* in its analysis. Accordingly, the Applications are **GRANTED IN PART** and **DENIED IN PART**.

Additionally, on May 16, 2005, Agouron filed an *Ex Parte* Application for the Court to consider *Dura*. [Doc. No. 88.] Plaintiff's Opposition to this Application includes argument on why *Dura* does not support Agouron's Motion to Dismiss. Plaintiffs' do not challenge Agouron's request for the Court to consider the new case. Therefore, as noted above, the Court will consider *Dura* in its analysis. Accordingly, Agouron's Application is **GRANTED**.

ally, a plaintiff must plead actual economic loss and proximate causation. *Id.* at 1634. However, the Supreme Court noted that its holding did not affect Fed.R.Civ.P. 8(a)(2)'s applicability. *Id.* In other words, the decision did not create a heightened pleading standard for loss causation.

Here, Plaintiffs allege that IRC's stock was overvalued during the class period because Defendants (1) failed to disclose material information about REMUNE's ineffectiveness on treatment of HIV or secondary markers; and (2) made numerous misrepresentations regarding the likelihood of REMUNE being approved by the FDA. Specifically, the Complaint states, "As a result of the defendants' misrepresentations, IRC's stock prices skyrocketed during the Class Period to as high as $18.31[.]" (Compl.¶ 20.)

Next, Plaintiffs allege that the price of the stock "collapse[d] as the truth regarding REMUNE emerged." (*Id.* ¶¶ 19, 20.) The Complaint specifically pleads that when the disappointing study results and Agouron's decision to terminate funding were finally revealed, the price of IRC's stock went from $18.31 to $2.00 per share. (*See* Compl. ¶¶ 19, 138).

As such, the Court finds that Plaintiffs have adequately claimed that (1) Defendants' wrongdoing caused stock prices to become artificially inflated; and (2) stock price dropped sharply when the truth became public. Moreover, the conjunction of these two allegations makes clear that Plaintiffs claim the disclosures caused the drop in stock price. This is sufficient under the Supreme Court's opinion in *Dura.* There the Court noted that the *Dura* complaint only pleaded artificial inflation, and this alone was insufficient. Specifically, the Court stated: "The complaint's failure to claim that share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone suffi-

cient." *Dura,* 125 S.Ct. at 1634. The Court further stated that "the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]" *Id.* In the present matter, Plaintiffs' Complaint contains the very allegations regarding share price decrease and public exposure to the truth the Supreme Court found lacking in the *Dura* complaint. Moreover, the Complaint adequately notifies Defendants of the losses claimed and the causal connection between the losses and Defendants' allegedly fraudulent conduct. Whether the alleged omissions and misstatements actually were the cause-in-fact of the price of IRC stock raises an issue of fact and, as such, is a question properly reserved for a motion for summary judgment or for the trier of fact. *See Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1126 (W.D.Mich.1996). Accordingly, the Court **DENIES** Defendants' Motion to Dismiss for absence of loss causation.

### c. Whether the Claim Is Time Barred

Defendants Carlo and IRC contend that Plaintiffs' claim under section 10(b) and rule 10b–5 is time barred. (Mot. at 18–19.) The Court disagrees.

 "Private causes of action under section 10(b) of the 1934 Act and Rule 10b–5 . . . have no statutorily-specified limitations period." *Berry v. Valence Technology, Inc.,* 175 F.3d 699, 703 (9th Cir.1999). "Thus, litigation instituted pursuant to § 10(b) and Rule 10b–5 must be commenced within one year after the discovery of the facts constituting the violation[.]" *Id.* (internal citations omitted); *see also In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1411 (9th Cir.1996) ("Section 10(b) and Rule 10b–5 complaints must be

filed within one year after the discovery of facts constituting the violation and within three years after such violation.").

■■■ "The Ninth Circuit has declined to decide whether the...statute of limitations is triggered by actual discovery or inquiry notice." *In re Infonet Services Corp. Sec. Litig.*, 310 F.Supp.2d 1106, 1114 (C.D.Cal. 2003); *see also Berry*, 175 F.3d at 704 ("[W]e need not decide whether actual discovery or inquiry notice applies."). However, the Ninth Circuit has implied that inquiry notice is the appropriate standard, and has expressed a preference for the Tenth Circuit's formulation of that standard in *Sterlin v. Biomune Sys., Inc.*, 154 F.3d 1191 (10th Cir.1998).[15] *See Berry*, 175 F.3d at 704 ("If we were to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of that standard.").

"*Sterlin* directs courts to focus on two questions." *In re Infonet*, 310 F.Supp.2d at 1114. First, when did the duty to investigate arise? *See Berry*, 175 F.3d at 704 ("First, did the... article raise sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further?"). In other words, did any of the alleged false or misleading statements "put Plaintiff[s] on inquiry notice[?]." *Sterlin*,

154 F.3d at 1204. The focus here is whether the alleged false or misleading information amounted to "storm warnings" sufficient to trigger a duty to investigate on Plaintiffs' part. *Id.See also Berry*, 175 F.3d at 705 ("While an investor need not have full knowledge of fraud in order reasonably to be expected to investigate worrisome allegations concerning his investments, he will not be presumed to have done so unless the allegations are sufficient to 'excite inquiry' into the possibility of fraudulent conduct.").

"Second, when should a reasonably diligent investor have discovered the facts underlying the alleged fraudulent activity?" *Id.* This is a factual question. *See Sterlin*, 154 F.3d at 1205 (remanding to the district court to determine "whether, in the exercise of reasonable diligence, Plaintiff should have discovered the facts underlying the alleged fraudulent activity prior to October 12, 1994, one year before he filed suit."); *Berry*, 175 F.3d at 706 (noting that it would have needed to "remand the case to the district court to determine when, if ever, a reasonably diligent investor should have discovered the facts underlying the alleged fraud").

■■■ "[T]he answer to the second question would determine when the statute of limitations began to run." *Berry*, 175 F.3d at 704.[16] Thus, inquiry notice "trig-

---

**15.** "Because 'courts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in public,' it is likely irrelevant whether a court employs the actual knowledge or notice inquiry standard." *In re Infonet*, 310 F.Supp.2d at 1114 (quoting *Berry*, 175 F.3d at 703 n. 4). In any event, "every circuit to have addressed the issue... has held that inquiry notice is the appropriate standard." *Berry*, 175 F.3d at 704 (citations omitted). The Court likewise finds inquiry notice appropriate.

**16.** "The objective of encouraging investors to file suit as soon as possible is not undermined by delaying the accrual of the statute of limitations until the plaintiffs, in the exercise of

reasonable diligence, should have discovered the facts underlying the alleged fraud. Delaying the accrual of the one-year limitations period until this time does, however, ensure that plaintiffs are given the opportunity to adequately develop the facts and determine whether those facts merit bringing suit, thus giving meaning to the term 'inquiry.' " *Sterlin*, 154 F.3d at 1202; *see also id.* ("While we recognize there is a strong federal interest in requiring plaintiffs to file suit soon after they are put on notice of their claims, the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims.").

gers an investor's duty to exercise reasonable diligence and…the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Sterlin,* 154 F.3d at 1201.

 "A defendant raising the statute of limitations…has the burden of proving the action is time barred." *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1406 (9th Cir.1995). Defendants IRC and Carlo have failed to meet that burden. Their failure is conceptual. They assert "the large quantity of negative information concerning REMUNE in 1999 triggered an obligation of investigation well before July 10, 2000"—a year before this action was filed. (Mot. at 19.) This equates arousal of suspicion with commencement of the limitations period. The statute begins running, not on the date of inquiry notice, but on the date Plaintiffs should have discovered the facts underlying the fraud. *See Berry,* 175 F.3d at 704; *see also Sterlin,* 154 F.3d at 1201 ("[T]he one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud."); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP,* 336 F.3d 495, 501 (6th Cir.2003) ( "[T]he limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud."); *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 367 (7th Cir.1997) (For the limitations period to run, "not only must the investor be on notice of the need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of reasonable diligence."). Thus, Defendants IRC and Carlo fail to address the second question: should a reasonable investor, armed with the triggering information, have uncovered the alleged fraud before July 10, 2000? As such, they have failed to meet their burden.

In any event, the Court finds that various alleged false and misleading statements did not even "raise sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further" before July 10, 2000. *Berry,* 175 F.3d at 704. The core of the Complaint is that Defendants made various false and misleading statements about the effectiveness of a drug they developed—REMUNE. Defendants claim IRC's statements in the Form 8–K, filed in July 1999, were sufficient to trigger Plaintiffs' duty to investigate. (*See* Mot. at 18.) The Court disagrees.

 "Inquiry notice is triggered by evidence of the possibility of fraud[.]" *Sterlin,* 154 F.3d at 1203. The disclosures in Form 8–K gave both a positive and negative analysis of REMUNE's effectiveness in treatment of HIV. *See Bovee v. Coopers & Lybrand,* 320 F.Supp.2d 646, 655 (S.D.Ohio 2004) ("In reviewing the various forms of public disclosures made…the Court concludes that, despite the many negative comments about MAW's financial wherewithal and corporate stability, reassuring statements were also made that could have negated the 'storm warning' effect of the disclosures. In this regard, the Court notes…it is not the 'storm warning' that triggers the limitations period[.]"); *In re Infonet,* 310 F.Supp.2d at 1115 (concluding that the "statements alone do not constitute adequate warnings of the upcoming storm, as the reports' warnings were accompanied by positive statements."). Form 8–K thus essentially raised questions about the ultimate viability of REMUNE—questions that it claimed were largely unanswerable at that time. *See also Berry,* 175 F.3d at 705 (holding that such a statement "certainly does not

excite inquiry into the possibility of fraud.").

In conclusion, Defendants IRC and Carlo have failed to show that Plaintiffs' section 10(b) and rule 10b–5 claim is time-barred. Accordingly, their Motion is **DENIED** as to this issue.

### d. Joint vs. Individual Liability

 The Complaint attributes three false or misleading statements to Agouron. These statements are embedded in the press releases IRC issued on May 17, 1999, May 10, 2000 and June 9, 2000. The Complaint quotes Moss in two IRC press releases—November 3, 1999 and October 31, 2000. The Complaint quotes Carlo in three press releases—May 17, 1999, November 3, 1999 and January 25, 2000, and further alleges that Carlo, along with IRC, "actively and jointly drafted, revised and approved the Prospectus and other written selling materials by which the secondary public offering of IRC's stock" was accomplished. Presumably, the Prospectus and the Registration Statement for the August 11, 2000 secondary public offering of IRC's stock are included in those selling materials.

Accordingly, Moss, Carlo and Agouron contend that their liability, if any, should be limited to their respective statements, since the Complaint fails to specify with particularity their conduct or knowledge as to the alleged false or misleading statements of the others. Plaintiffs respond that Carlo, Moss or Agouron "are liable...even if the [other] statements are not directly attributable to [them] under the group pleading doctrine." (Opp'n at 35.) Plaintiffs further argue that the group pleading doctrine remains a valid theory of liability after the PSLRA. (*Id.*) As set forth below, Plaintiffs' reliance on the group pleading doctrine is misplaced. Thus, Defendants liability, if any, is based solely on the statements directly attributed to them.

 The "group published" or "group pleading" doctrine presumes that false and misleading information conveyed in documents, including press releases, are made by the collective action of a corporation's officers. *See In re GlenFed,* 60 F.3d at 593 (9th Cir.1995) ("In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information,' it is reasonable to presume that these are the collective actions of the officers."). The doctrine thus "allows Plaintiffs to attribute statements to individual defendants based upon their corporate titles, rather than pleading facts that show that a defendant actually made, authored, or communicated a statement." *In re Syncor,* 327 F.Supp.2d at 1171. To rely upon this presumption, "plaintiffs' complaint must contain allegations that...[the defendant] either participated in the day-to-day corporate activities or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *In re GlenFed,* 60 F.3d at 593.

Since the PSLRA's enactment, courts have struggled to determine the continued viability of the group published doctrine. The Ninth Circuit has not decided the issue, and district courts are split. *Compare In re Secure Computing Corp.,* 184 F.Supp.2d 980, 991 (N.D.Cal.2001) (reaffirming its finding that the group published information presumption survives the PSLRA); *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 2000 WL 1727377 at *24–25 n. 18 (N.D.Cal.2000) (assuming that the group pleading doctrine survived enactment of the PSLRA); *Stanley v. Safeskin Corp.,* 2000 WL 33115908 at *4 (S.D.Cal. 2000) (rejecting argument that group

pleading doctrine did not survive the PSLRA); *with Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350–51 (S.D.Cal.1998) (J. Miller) (ruling that the PSLRA is fundamentally inconsistent with the group published information doctrine); *In re Ashworth, Inc. Sec. Litig.,* 2000 WL 33176041 at *12 (S.D.Cal.2000) (J. Lorenz); *In re Syncor,* 327 F.Supp.2d 1149, 1172 (C.D.Cal.2004).

In *Brooktree,* the court found the group-published information doctrine to be inconsistent with the PSLRA because the doctrine allows facts to be presumed while "the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant.'" *Id.* at 1350 ("[T]he continued vitality of the judicially created group-published doctrine is suspect since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be plead in regards to 'each act or omission' sufficient to give 'rise to a strong inference that **the defendant** acted with the required state of mind.'") (Emphasis in original). Relying, in part, on *Brooktree,* the Fifth Circuit, the first federal appellate court to address the issue, recently found that the "group pleading" doctrine did not survive the PSLRA. *See Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 363–366 (5th Cir.2004). In *Southland,* the Fifth Circuit concluded that group pleading cannot be reconciled with the PSLRA's requirement that Plaintiffs must plead specific facts as to each act or omission by the defendants and demonstrate that defendants possess the requisite scienter. *Id.* at 365. Other courts have ruled that the doctrine is no longer applicable because it is inconsistent with the PSLRA's requirement that scienter must be pled with particularity for each defendant. *See Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998) ("It is nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each defendant, but to allow him to rely on group pleading in asserting that the defendant made the statement or omission.").

"It has also been suggested that the group-published information doctrine is no longer viable because it is inconsistent with the overall spirit of the PSLRA in general, and the PSLRA's discovery stay provision at § 78u–4(b)(3)(B) in particular." *In re Lockheed Martin Corp. Sec. Litig.,* 272 F.Supp.2d 928, 935 (C.D.Cal. 2002). "Group pleading arguably allows plaintiffs to name, as defendants, people or corporations who cannot be tied by specific facts to allegedly false or misleading statements without discovery. But, 'Congress clearly intended that complaints in [post-PSLRA] securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed.'" *Id.* (quoting *Medhekar v. U.S. Dist. Court,* 99 F.3d 325, 328 (9th Cir.1996)).

■■■ The group-published doctrine is also inconsistent with the PSLRA in that it requires courts to accept a plaintiff's belief regarding the individual liability of a corporate officer even when the belief is based on the officer's job title alone. The doctrine could essentially be a mechanism for pleading an officer's involvement in the issuance of a corporate statement based on information and belief. The PSLRA permits pleading on information and belief, but, as noted above, only if the complaint states with particularity all facts upon which the belief is based. *See* 15 U.S.C. § 78u–4(b)(1). Implicit in this requirement is a mandate that the stated facts provide an adequate basis for the asserted belief. Thus, a plaintiff can attribute to a particular defendant a false or misleading

statement contained in a group-published document based on information and belief as long as the plaintiff satisfies the corresponding PSLRA requirements. For example, if the alleged misleading statement appears in a press release issued by a company discussing financial performance, a plaintiff could plead on information and belief that the chief financial officer is responsible for making the statement if the plaintiff can plead with specificity why the officer's position directly involves such duties or why a specific corporate policy requires that chief financial officer make such releases. *Heartland Wireless,* 26 F.Supp.2d at 916 n. 2 (holding that "[b]ecause a plaintiff can plead on the basis of information and belief, he need not rely on group pleading."). Under no circumstances should the group-published information doctrine relieve plaintiffs of their burden to plead scienter. *See* 15 U.S.C. § 78u–4(b)(2).

Courts favoring the continued application of the group-published information doctrine offer only modest support for their positions. Some courts simply point out that the doctrine has nothing to do with scienter and reaffirm the reasonableness of the doctrine's underlying presumption. *See BankAmerica Corp. Secs. Litig.,* 78 F.Supp.2d 976, 988 (E.D.Mo.1999) ("[T]he doctrine has nothing to do with scienter. Rather, it is a reasonable presumption that the contents of company-published documents and press releases are attributable to officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company."). At least two courts in the Ninth Circuit, including one in this District, partially based their decision to continue recognizing group pleading because the Ninth Circuit's opinion in *Silicon Graphics* failed to question the enduring viability of the doctrine. *See Stanley v. Safeskin Corp.,* 2000 WL 33115908, at *4 (S.D.Cal.2000) ("The Ninth Circuit in *Silicon Graphics* neither

accepted nor refuted the district court's reliance on this doctrine."); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998) (citing the defendant's failure to offer case authority for the doctrine's abolition as a second reason for its decision).

 Against this backdrop, Plaintiffs' reliance on the group pleading doctrine is rejected. The group published doctrine permits an inference of wrongdoing not based on defendant's conduct, but based solely on defendant's status as an officer or director of a corporation. This is in contravention of the PSLRA's pleading requirements. Such is the case here. Plaintiffs' Complaint seeks to attribute statements in the IRC press releases and SEC filings to Defendants Moss, Carlo and Agouron. As for Agouron, the Complaint does not even allege that Agouron was an active participant in IRC's day-to-day operations during the class period, much less allege that it was directly involved in the preparation of the allegedly misleading statements. As for Carlo and Moss, the Complaint sets forth allegations that Moss and Carlo "had the authority to control the contents of IRC's quarterly reports, press releases and presentations to securities analysts...[and] had copies of IRC's reports and press releases before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or correct them." (Compl.¶ 32.) But, under the PSLRA, "a complaint seeking to attribute information published by an organization to an individual defendant should state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements." *In re Lockheed,* 272 F.Supp.2d at 936.

Defendants Moss, Carlo and Agouron's principal liability under section 10(b) and rule 10b–5 will, therefore, be based solely on statements directly attributable to

them. Plaintiffs, however, may seek leave to amend. Should Plaintiffs decide to amend the Complaint, they are instructed to plead specific facts pertaining to each Defendant's contribution to the misleading statements and omissions alleged. In other words, Plaintiffs must allege facts tying each of the alleged misstatements and omissions to each of the Defendants, including Moss, Carlo and Agouron. *See In re Boeing Sec. Litig.*, 40 F.Supp.2d 1160, 1166 (W.D.Wash.1998) ("[A] plaintiff must attribute the misleading statements upon on which his claim is based to a particular defendant."); *In re Silicon Graphics*, 970 F.Supp. 746, 752 (N.D.Cal.1997) ("[T]he plaintiff is obligated to distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.").

### d. Control Liability

 "[U]nder Section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . .; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000).[17] "The statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998). "Plaintiff need not show that the defendant was a culpable participant in the violation, but defendant may assert a 'good faith' defense." *Everex Systems*, 228 F.3d at 1065. Thus, "[t]o establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from

the controlled corporation's scienter." *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir.1993).

 Here, as discussed above, Plaintiffs have adequately pled violations of section 10(b) and rule 10b–5. Therefore, Plaintiffs prevail on the first prong of the section 20(a) requirements. Turning to the second prong: "Whether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Everex Systems*, 228 F.3d at 1065 (internal citations omitted); *see also Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir.1987) ("[T]he concept of control, in the context of the securities law, is an elusive notion for which no clear-cut rule or standard can be devised.").

Plaintiffs allege control liability under section 20(a) of the 1934 Act against Carlo and Moss. (*See* Compl. ¶¶ 164–165.) To establish control, Plaintiffs must allege that Defendants Moss and Carlo were active in the day-to-day affairs of IRC or that they exercised specific control over the preparation and release of the alleged statements. *Id.* They have adequately done so.

The Complaint contains numerous allegations regarding Carlo and Moss's involvement in misleading press releases. In addition, the Complaint alleges that both Carlo and Moss were involved in the day-to-day business of IRC in their roles as Chief Executive Officer, and Chairman of the Board and co-founder, respectively. Plaintiffs do not simply allege that they held these positions; their roles are described. According to the Complaint, Moss and Carlo had the authority to con-

---

**17.** "The SEC has defined 'control' to mean: '[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, wheth-

er through ownership of voting securities, by contract, or otherwise.' " *Howard v. Everex Systems*, 228 F.3d 1057, 1065 (9th Cir.2000) (quoting 17 C.F.R. § 230.405).

trol the contents of IRC's quarterly reports, press releases and presentations to securities analysts. They also had copies of IRC's reports and press releases before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or correct them, which include substantial involvement in those areas of the company that are at issue in this case.

Therefore, Plaintiffs have stated a valid cause of action under section 20(a) against Defendants Carlo and Moss acting as controlling persons of IRC. *See In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1089 (N.D.Cal.2001) ("[P]laintiffs allege that the individual defendants, 'by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised.' The court finds these allegations sufficient to support an inference that the individual defendants controlled Cylink and its operations."); *In re Amylin Pharmaceuticals*, 2002 WL 31520051 at *10 (S.D.Cal.2002) ("The [complaint] alleges that Cook was Chairman and CEO of Amylin and as such had power and authority to engage in the conduct that is alleged to be wrongful. The [complaint] alleges that Greene, as a co-founder, former officer and the largest shareholder of Amylin was involved in the day-to-day activities of the corporation. This

is sufficient for pleading purposes."). Accordingly, the Court DENIES Defendants' Motion to Dismiss this claim.

### e. Defenses

### (i) The PLSRA Safe Harbor

 Agouron argues that its allegedly false or misleading statements in the May 17, 1999 and May 10, 2000 press releases are protected under the Safe Harbor Provision of the PSLRA because they are forward-looking statements surrounded by cautionary language.[18] (Mot. at 14.) The Court disagrees.

"The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Employers Teamsters Local Nos. 175 v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir.2004) (internal citations omitted). "The PSLRA created a statutory version of this doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements."[19] *Id.*

---

18. For undisclosed reasons, Agouron does not challenge its alleged false or misleading statements during the June 9, 2000 press release. (*See* Mot. at 2, 14.)

19. The PSLRA's safe harbor provision reads:
 1. Except as provided in subsection (b) of this section, in any private action arising under this chapter [15 USCS §§ 78a *et seq.*] that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
 (A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.
15 U.S.C. § 78u–5(c).
 The term "forward-looking statement" means:
(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

Therefore, "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)).

 "[T]o determine whether the...doctrine immunizes defendants' allegedly false and misleading statements, [the Court] must analyze what, if any, cautionary statements defendants made. The cautionary statements must be 'precise' and 'directly address...the defendants' future projections." *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir.1996) (internal citations omitted). "Blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim." *Id.* Language is meaningful and cautionary if it puts an investor "sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Ivax*, 182 F.3d at 807; *see also In re Champion Enterprises, Inc. Sec. Litig.*, 144 F.Supp.2d 848, 859 (E.D.Mich.2001) ("In order to be meaningful, the cautionary language must warn of risks of similar significance to the risk actually realized...there must be more than a recitation of mere generalized risks applicable to any business venture, such as the state of the economy. The risks should be specifically tailored to the issuer's business and to the forward-looking statements."). Put differently, the cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

 Where a statement is "mixed," *i.e.*, contains both forward-looking and non-forward-looking elements, and where a plaintiff alleges the entire statement is misleading because it omitted material information, the court should determine whether the statement as a whole, not a particular part, is misleading. *See Ivax*, 182 F.3d at 806 ("If the allegation is that the [whole] statement is misleading, then it makes no sense to slice the [statement] into separate sentences.").

The "doctrine reflects nothing more than 'the unremarkable proposition that statements must be analyzed in context.'" *Fecht*, 70 F.3d at 1082 (9th Cir.1995) (internal citations omitted). It "is thus wholly consistent with [the] analysis that whether a statement in a public document is misleading may be determined as a matter of law only when reasonable minds could not disagree as to whether the mix of information in the document is misleading." *Id.* "A motion to dismiss for failure to state a claim will succeed only when the documents containing defendants' challenged statements include 'enough cautionary language or risk disclosure,' that 'reasonable minds' could not disagree that the

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i).

challenged statements were not misleading." *Id.* (Emphasis in original). As discussed below, Agouron's statements do not meet this standard.

### (A) The May 17, 1999 Press Release

According to Agouron, "In the May 17, 1999 Press Release, Agouron announced its intention to support another study of Remune based on promising results that were attained by Study 806." (Mot. at 14.) Specifically, the press release stated that Agouron hoped to demonstrate REMUNE's ability to control viral load, "in light of an agreement previously reached with the Food and Drug Administration that an application for the marketing of REMUNE could be submitted based upon favorable virological endpoints." (Compl. ¶ 68.)

Agouron seeks protection based on its contention that two other statements included in the press release sufficiently caution investors against reliance on its positive projections. First, Agouron points to a statement by its President and Chief Executive Officer, Peter Johnson. As quoted in the press release, Johnson stated:

> "Concluding the clinical endpoint trial at this time also presents a unique opportunity to address a very contemporary question: can immune-based therapy extend the duration of anti-HIV response induced by HAART under the most challenging conditions? The potential to produce this effect remains one of REMUNE's most important attributes."

(Mot. at 14.)

Agouron also points to language found toward the end of the press release, which reads:

> "Actual results could vary materially from those expected due to a variety of risk factors, including whether or when additional clinical trials for REMUNE will be initiated or successfully complet-

ed, and those risks set forth from time to time in The Immune Response Corporation's SEC filings[.]"

(*Id.* at 15:2–5.)

To the extent that Agouron highlights Study 806 results that were already available at the time, such statements are not forward-looking and therefore are not eligible for safe harbor protection. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir.1994) (finding that the bespeaks caution doctrine "applies only to precise cautionary language which addresses itself to future projections, estimates or forecasts"). However, some of Agouron's May 17, 1999 statements are forward-looking in that they attempt to generate excitement about the company's future success in marketing REMUNE following the anticipated results of studies yet to be conducted. Nonetheless, the Court finds that the potential for misleading investors by such forward-looking statements is not unquestionably nullified by the accompanying disclaimers.

Regarding the first allegedly cautionary statement, the mere fact that it presents the discovery of REMUNE's impact on virological markers in terms of an "opportunity" to answer a "question" does not detract from the otherwise optimistic tone of Agouron's commentary. All scientific studies seek to answer an unknown. Were the conclusions foregone, such studies would not be necessary. The substance of Agouron's statement lies in its focus on the importance of REMUNE's "potential" efficacy. Moreover, Agouron fails to explain why this statement in particular contributes to the cautionary aspect of the press release overall.

█ As for the second allegedly cautionary statement, the Court finds its warnings too generic to invoke safe harbor protection. The statement suggests that (1) future studies may never be completed;

or (2) prolonged delays may occur. Additionally, Agouron refers to other factors presented in "SEC filings" that may threaten REMUNE's ultimate success. However, Agouron does not specify what these risk factors are, instead leaving investors to obtain these other documents and compare their contents with the May 17, 1999 press release themselves.

◼ Under the PSLRA's safe harbor provision, a "meaningful cautionary statement" must "identif[y] important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i); *Employers Teamsters Local Nos. 175 v. Clorox Co.*, 353 F.3d at 1133. General disclaimers may inadequately prevent enthusiastic forecasts from being misleading. *See Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir.1996) (holding cautionary language inadequate where plaintiffs alleged specific factual misrepresentations and disclosed risks were "so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading"); *see also In re Sec. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 909 (S.D.Tex.2001) ("The insertion of a blanket disclaimer in a . . . document that it may contain certain forward-looking statements is not sufficient.").

After explaining that additional REMUNE studies are key to revealing "REMUNE's most important attributes," Agouron then warns that such study results may never become available. Certainly, clinical research studies are never without potential obstacles. Such a general warning fails to present investors with any indications as to the likelihood of the future REMUNE studies facing obstacles. The PSLRA drafters did not intend boilerplate cautionary language to be sufficient. Rather, "[t]he cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." H.R. Conf. Rep. No. 104–369, at 53, 1995 U.S. Code Cong. & Admin. News 1995, at pp. 730, 742. "[V]ague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir.1993).

Referring investors to the SEC filings for additional warnings is similarly general in nature. Moreover, Agouron has not established that cautionary language in a different public document than the one in which the allegedly misleading information appears may be considered in a safe harbor determination. *See In re Silicon Graphics*, 1996 WL 664639, at *14 (N.D.Cal.1996) (finding no prior authority for cautionary language in various documents to counteract misleading oral statements); *see also Powers v. Eichen*, 977 F.Supp. 1031, 1044 (S.D.Cal.1997) (J. Brewster) (questioning the fact that cautionary language in 10–K form was not included in the actual releases or statements alleged to be misleading). Moreover, the March 30, 1999 Form 10–K and the May 11, 1999 Form 10–Q Agouron cites as containing "more extensive risk disclosure" do not specifically address the risks involved with the proposed virological marker studies referred to in the May 17, 1999 press release.

**(B) The May 10, 2000 Press Release**

◼ Turning to the May 10, 2000 press release, Agouron again fails to establish immunity under the safe harbor provision. First, Agouron points to the portion where it announced that "a pivotal trial has been initiated to evaluate the safety and efficacy of the investigational product RE-

MUNE[.]" (Reply at 14.) Agouron next references the same boilerplate cautionary language the May 17, 1999 press release contained. For essentially the same reasons discussed above, these statements fail to establish that Agouron is entitled to safe harbor protection.

### (C) Conclusion

In conclusion, the Ninth Circuit has held that the bespeaks caution doctrine or PSLRA's safe harbor provision should be applied narrowly, and courts should dismiss claims based on the bespeaks caution doctrine only where documents containing defendants' challenged statements include enough cautionary language that reasonable minds could not disagree that the challenged statements were not misleading. "Inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading [.]" *Eichen*, 977 F.Supp. at 1043. Because the Court finds that reasonable minds could disagree, the Court accordingly **DENIES** Agouron's Motion to Dismiss Plaintiffs' section 10(b) claim on safe harbor grounds.

### (ii) The Truth–on–the–Market Defense

 Moss contends that the "truth-on-the-market" doctrine invalidates Plaintiffs' claims, because all information material to investors was publicly available before the August 11, 2000 public offering. (Mot. at 21–22.) Plaintiffs counter that the misrepresented information was not transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance Defendants' misleading impressions about REMUNE's effectiveness on viral loads. (Opp'n at 42.) Plaintiffs further urge the Court not to resolve the issue as a matter of law, arguing that (1) Defendants bear a "heavy burden of proof," and (2) the issue is more appropriately resolved by trial than by a motion to dismiss. (*Id.*) The Court agrees.

 Under the truth-on-the-market doctrine, if "the information that defendants are alleged to have withheld from or misrepresented to the market has entered the market through other channels, the market will not have been misled." *In re Stac*, 89 F.3d at 1409. But, "before the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations." *Provenz v. Miller*, 102 F.3d at 1492–93. "The defendants bear a heavy burden of proof." *Id.* Dismissal "is proper only if they show that no rational jury could find that the market was misled. If the evidence presents a sufficient disagreement to require submission to the jury," a motion to dismiss should be denied. *Id.* The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Moss argues that the market was aware of the allegedly undisclosed facts. Specifically, Moss claims that "early termination of the 806 Study and the Kahn/Lagakos view of its results became public knowledge almost immediately and certainly long before the August 2000 secondary offering." (Mot. at 21.) Additionally, Moss notes that "termination of the 806 Study was first reported in the May 17, 1999 press release[,]" and that the "impact of termination then was disclosed in publicly filed documents such as the Form 8–K filed on June 2, 1999, Form 10K filed on

August 13, 1999, and the Shelf Registration Statement filed on August 19, 1999." (*Id.*) Moss further points out that "the Kahn/Lagakos interpretation of the results of the 806 study were disseminated by presentation at the ICAAC in September, 1999." (*Id.*) Moreover, Moss concludes, "it is to be expected that analysts would seek out and become familiar with information presented at industry conferences, rather than waiting for or relying exclusively on information addressed to the financial markets. (*Id.* at 22.)

Notwithstanding the aforementioned disclosures, the Court cannot conclude as a matter of law that the market had sufficient credible information indicating that Defendants' optimism about REMUNE was unwarranted. Plaintiffs allege that Defendants failed to disclose specific problems with their sub-study of REMUNE, which was directly contradicted by the more comprehensive Study 806. *See Provenz*, 102 F.3d at 1493 (finding that analyst reports containing information about the risky nature of the company's stock did not counterbalance defendants' misleading statements because there was "no mention in the reports of defendants' allegedly improper revenue recognition practices"). Plaintiffs also suggest that Defendants attempted to suppress public knowledge of the ICAAC presentation. (Compl.¶ 99.) Moreover, determination of this issue would require the Court to consider, in part, documents—Form 10K filed on August 13, 1999, Shelf Registration Statement filed on August 19, 1999—which were neither quoted nor referenced in Plaintiffs' Complaint; nor are the documents "integral" to any statement made in the Complaint. In light of the extremely high burden posed by this fact-based inquiry, Moss

has not demonstrated that the truth-on-the-market doctrine bars liability and his Motion to Dismiss on this ground is **DENIED**.

### B. The 1933 Securities Exchange Act

#### 1. Whether Plaintiffs Allege Viable Claims

To state a claim under the 1933 Act, Plaintiffs must allege (1) that Defendants made false or misleading statements of fact on a registration statement or prospectus and (2) that such statements were material. *See* Securities Act 1933 § 11, 12; 15 U.S.C. §§ 77k, 77*l*. Section 11 imposes liability on every person who signed the registration statement, every director of the issuer and every underwriter. 15 U.S.C. § 77k. Section 12 imposes liability on any person who offers to sell or sells a security. 15 U.S.C. § 77*l*. As set forth below, Plaintiffs' allegations are sufficient to state a claim under sections 11 and 12(a)(2).

[61–64] Sections 11 and 12(a)(2) of the 1933 Act "are not governed by the heightened pleading standards of the PSLRA[.]" *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133–34 (9th Cir.2002). But, "they are subject to Federal Rule of Civil Procedure 9(b)." *Id.* Under Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *In re Stac*, 89 F.3d at 1404.

■ "Section 11 provides for civil liability for filing a false registration statement." [20] *Falkowski*, 309 F.3d at 1133. "Liability . . . is virtually absolute, even for innocent misstatements." *Herman &*

---

**20.** A registration statement "means a filing that includes the prospectus and other information required by section 7 of the Securities Act." 12 C.F.R. § 16.2(m). A prospectus is defined as "an offering document that includes the information required by section 10(a) of the Securities Act." 12 C.F.R. § 16.2(1).

*MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *see also In re Stac,* 89 F.3d at 1404 ("No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions."). "A Section 11 plaintiff needs to plead only that the registration statement contained a material omission or misrepresentation." *In re CBT Group PLC Sec. Litig.,* 2000 WL 33339615 at *2 (N.D.Cal.2000) (citing *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994)); *see also In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 201 (E.D.N.Y.2000) ("Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact.") (quoting *Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683).

 The Complaint here alleges that IRC and Carlo filed a Prospectus and Registration Statement in connection with their August 8–11, 2000 secondary public offering that was "materially inaccurate and misleading." (Compl.¶¶ 139–155.) It also gives details about the contents of the statement and contains information on why it was false. (Compl.¶¶ 123–125.) Thus, it meets the requirements of Rule 9(b) and sufficiently states a claim under Section 11.[21] *See In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 316 (8th Cir.1997) ("The plaintiffs alleged that they bought Nations Mart stock and that '[t]he Offering Materials contained untrue statements of material facts and omitted facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'

Specific instances of misstatements were also pleaded. Given the broad scope of liability under § 11 and the liberal pleading requirements of Federal Rule 8(a), these allegations are sufficient to state a claim."); *In re CBT Group PLC Sec. Litig.,* 2000 WL 33339615 at *4 ("The allegations of Section 11 violations for false financial statements in both complaints are marginal, but they suffice for the pleading stage.").

 The Complaint also adequately states a claim under section 12(a)(2). "Section 12(a)(2) [formerly section 12(2)] provides for civil liability of securities sellers to purchasers if the seller used certain instruments, including a prospectus, containing untrue statements or material omissions." *Falkowski,* 309 F.3d at 1133–34 (citing 15 U.S.C. § 77*l*(a)(2)). Section 12 turns on status, not scienter: it imposes liability without requiring "proof of either fraud or reliance." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 582, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). "To plead a claim under § 12(a)(2) of the 1933 Act, a plaintiff must allege that a person who offered or sold a security by means of a prospectus made misstatements or omissions in the prospectus." *In re Metricom Sec. Litig.,* 2004 WL 966291 at *9 (N.D.Cal.2004); *see also In re Fortune Systems Sec. Litig.,* 604 F.Supp. 150, 158 (C.D.Cal.1984) ("Section 12(2) establishes the civil liability of any person who sells a security by means of a prospectus containing material misrepresentations or omissions."). Again the Complaint alleges that the "prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed

---

**21.** The Complaint further alleges that Defendant Carlo signed the Registration Statement for the August 8–11, 2000 secondary public offering. (Compl.¶ 143.) *See also In re Har-* *monic Inc. Sec. Litig.,* 163 F.Supp.2d 1079, 1085 (N.D.Cal.2001) ("Persons liable under § 11(a) are those who signed the registration statement[.]").

and failed to disclose material facts." (Compl.¶ 148.)

IRC and Carlo argue Plaintiffs' claim is not actionable because the Prospectus disclosed any and all risks concerning RE-MUNE. The Court disagrees. The Court has reviewed Plaintiffs' allegations along with the "Risk Factors" section of the Prospectus, as cited by Defendants. While some risks were disclosed in the Prospectus, the overall determination of whether there was adequate disclosure or whether they rendered the allegedly misleading statements immaterial will not be made at this time. As previously noted, whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact. *See Fecht,* 70 F.3d at 1081. "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw,* 74 F.3d at 959. The Court finds that Plaintiffs have sufficiently alleged that the Prospectus was misleading. Accordingly, Defendants Motion to Dismiss on insufficient pleading grounds is **DENIED**.

### 2. Whether Plaintiffs Adequately Alleged Standing

■■ IRC and Carlo next argue that Plaintiffs lack standing to bring section 11 and 12 claims. (Mot. at 24–25.) "Under § 11, purchasers of stock have standing to sue if they can trace their shares to an allegedly misleading registration statement." *In re SeeBeyond Technologies Corp. Sec. Litig.,* 266 F.Supp.2d 1150, 1171 (C.D.Cal.2003); *see also Stack v. Lobo,* 903 F.Supp. 1361, 1375 (N.D.Cal.1995) ("Claims may be brought under § 11 . . . by those who purchased securities in a public offering and by those whose securities are traceable to the public offering."). Under § 12(a)(2), standing may be found where the plaintiff purchased the security directly from the issuer of the prospectus. *See*

*Hertzberg v. Dignity Partners,* 191 F.3d 1076, 1081 (9th Cir.1999).

IRC and Carlo argue that dismissal of the § 11 and § 12 claims is warranted, because Plaintiffs "fail to allege facts to show that any named Plaintiff purchased stock issued in IRC's public offering in August 2000." (Mot. at 24–25). The Court disagrees.

■■ The Complaint expressly states that the § 11 claim is raised "on behalf of the Class of purchasers of IRC stock pursuant to the Prospectus and Registration Statement issued in connection with IRC's August 8–11, 2000 $15 million secondary public offering[.]" (Compl.¶ 141.) Additionally, regarding the § 12 claim, the Complaint asserts that "Plaintiffs and the other members of the Class purchased or otherwise acquired IRC shares pursuant to the defective Registration Statement and Prospectus." (Compl.¶ 152.) As such, those Plaintiffs who actually did purchase stock through the secondary public offering have standing to pursue § 11 and § 12 claims. While further proof may later be required to establish whether any Plaintiffs actually did purchase through the secondary public offering, the Complaint provides sufficient grounds for a presumption of standing at this stage of the action. Accordingly, Defendants Motion to Dismiss these claims for lack of standing is **DENIED**.

### 3. Control Liability

■■ Plaintiffs allege "control-person liability" under section 15 of the 1933 Act. (*See* Compl. ¶¶ 156–158.) Section 15 imposes secondary liability on one who "controls" any person who is liable for a primary violation under either section 11 or section 12 of the Securities Act of 1933. *See In re Diasonics Sec. Litig.,* 599 F.Supp. 447, 459 (N.D.Cal.1984) (quoting 15 U.S.C. § 77o ("Section 15 of the Securi-

ties Act of 1933 provides for 'secondary liability' for 'every person who, by or through stock ownership, agency, or otherwise,...controls any person liable under [§ 11 or § 12.]' ")). In other words, there must be an underlying section 11 or 12 violation in order for section 15 liability to attach.

As discussed above, Plaintiffs state viable claims under sections 11 and 12. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990); *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996) ("To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed[.]") Moreover, the Complaint states that "[t]he defendants, by reason of their stock ownership, management positions, and/or membership or representation on the Company's Board of Directors, were controlling persons of the Company and had the power and influence, and exercised their power and influence, to cause IRC to engage in the violations of law[.]" (Compl.¶ 158.)

Therefore, the Court finds that a viable claim for § 15 control liability has been alleged. Accordingly, the Court **DENIES** Defendants' Motion to Dismiss the control liability claim.

### Conclusion and Order

Plaintiffs' claim under section 10(b) and rule 10b–5 of the 1934 Act is not time barred, and Plaintiffs adequately state a claim under the 1934 Act. However, Defendants' principal liability under section 10(b) and rule 10b–5 is individual—each Defendant's liability is limited to the allegedly false and misleading statements he or it made. As such, the Court **DENIES** Defendants' Motions to Dismiss the section 10(b) and rule 10b–5 claim. Plaintiffs also adequately state a claim for control liability under section 20(a) of the 1934 Act. Therefore, the Court **DENIES** the Motion to Dismiss the section 20(a) claim. Addi-

tionally, Plaintiffs adequately allege claims under sections 11 and 12(a)(2) of the 1933 Act, plus a claim for control liability under section 15 of the 1933 Act. As such, the Court **DENIES** the Motions to Dismiss these claims.

**IT IS SO ORDERED.**